1815.

MURRAY
v.
BALLOU.

———◆ ✳ ◆———

*Nov.* 14th.

## MURRAY AND WINTER *against* BALLOU AND HUNT.

A *lis pendens*, duly prosecuted, is notice to a purchaser, so as to affect and bind his interest by the decree ; and the pendency of the suit is deemed to commence from the service of the *subpœna*, after the bill is filed.

A purchaser of A., a trustee, is not chargeable with notice of the *trust*, by means of the *registry* of a deed from H. to B., reciting that A. had executed a declaration of the trust.

A person claiming as a *bona fide* purchaser, for a valuable consideration, must deny the fact of notice of a trust, and of every circumstance from which such notice might be inferred.

If a purchaser has notice of the trust at the time of purchase, he himself becomes a trustee, notwithstanding the consideration he has paid.

A purchaser of land buys at his peril, and is bound to look to the title and to the competency of the vendor.

A purchaser of land chargeable with constructive notice only, by means of a *lis pendens*, is not to be charged with *costs*, there being no actual fraud, though the purchase is set aside on the ground of the implied fraud.

Whether a *latent equity* in a third person, will defeat a *bona fide* assignee, without notice of his rights, except it be an assignment by an executor, which carries, on the face of it, notice of his *fiduciary* character ? *Quære.*

THE bill, which was filed in *October*, (after the 10th,) 1814, stated, that the plaintiff, *Winter*, was *trustee* of *Heatley*, for certain lands, including a subdivision of lot No. 26., in *Cosby's Manor*, containing 50 acres. That *Winter* having failed in the due discharge of his trust, a bill was filed against him, in 1809,* charging him with a breach of such trust ; and an injunction was issued, enjoining him from acting as trustee, &c. selling any of the trust estate, or the securities or

* Vide *Green v. Winter, ante*, p. 26. 60. 77.

funds thereof; which injunction was duly served in *February*, 1809, and the injunction published in the *Utica Gazette*, in the county in which the lands are situated. That *Winter*, afterwards, by the order of this court, was superseded in his *trust*, and *Murray*, the other plaintiff, appointed *receiver*, and authorized to use the name of *Winter* in suits, &c. That *Winter*, in *August*, 1810, sold the premises, lot No. 26., to the defendant, *Ballou*, and took his bond and mortgage for the consideration money, which were afterwards assigned to the defendant *Hunt*, who, suspecting the authority of *Winter*, cancelled that bond and mortgage, and took a new bond and mortgage from *Ballou* to himself. The bill charged *Hunt* with notice that *Winter* had no authority to sell, without the previous approbation of *N. Pendleton*, *Robert Murray*, and *C. Sands*.

The defendant, *Ballou*, in his answer, denied all knowledge of the suit in chancery, or of the injunction, except the publication of a notice of it in the *Utica Gazette*, in *March*, 1812. He stated, that he purchased the premises of *Winter*, in *August*, 1810, for 950 dollars, and received a deed the 31st of *October*, 1810, and gave a bond and mortgage. That, on the 24th of *November*, 1811, the defendant, *Hunt*, applied to him, and offered to advance him some money, provided he would secure the same, together with the bond and mortgage given to *Winter*, by a new bond and mortgage on land in *Utica*, which offer he accepted, and *Hunt* paid him 200 dollars; and he, thereupon, executed a bond and mortgage to *Hunt*, for 1,222 dollars and 4 cents, which had since been paid. That at the time of his purchase of *Winter*, and at the time of giving the bond and mortgage to *Hunt*, he had no knowledge of the injunction, or of any defect or suspension of power in *Winter* to sell; but he admitted that, *before he paid the money* to *Hunt*, he knew that the power of *Winter* was suspended; but he never recived any notice not to pay the money to *Hunt*, and did not suspect that *Hunt* was not

entitled to receive the money, which he paid to him *bona fide.*

The defendant, *Hunt*, also denied all knowledge of the chancery suit, injunction, &c. until the notice published in the *Utica Gazette*, in *March*, 1812. He admitted that, on the 3d of *November*, 1810, the bond and mortgage of *Ballou* were assigned to him, by *Winter*, with others, which he had agreed to accept in payment of certain shares in glass works, sold to *Winter ;* that he had not, then, the least suspicion of any defect of right or title in *Winter* to the bond and mortgage ; nor did he make any inquiry as to the title, or how *Winter* acquired them ; that he paid *Winter* a full and valuable consideration for the bond and mortgage. That, on the 27th of *November*, 1811, he applied to *Ballou* for payment of an instalment on the bond ; and as *Ballou* could not, conveniently, pay, and wanted money, he agreed to lend him a sum, and take a new bond for it, with the amount of the former bond, and a mortgage on land in *Utica*. That the new bond and mortgage were paid off and discharged on the 1st of *October*, 1814. That, in the winter of 1812, he was called as a witness before the referees, in the cause of *Green* v. *Winter*, in this court, and was, afterwards, told that *Winter* was charged, by the *cestuy que trust*, with the securities taken for the land he had sold, and, among others, with the bond and mortgage given by *Ballou*.

The defendant, *Hunt*, admitted, that when he cancelled the bond and mortgage of *Ballou*, assigned to him by *Winter*, he had heard of a difficulty between *Green and his wife*, and *Winter*, relative to the *trust ;* but the nature or extent of it he did not know, nor did he believe that it affected his case, or the acts of *Winter*, in regard to third persons.

The proofs and exhibits in the cause consisted, chiefly, of the pleadings and proceedings in the suit of *Winter* v. *Green*, for a summary of which, see *ante*, p. 26. 44. 60., and the final decree pronounced in that cause, the 5th of *Octo-*

*ber*, 1815. By that decree, it was ordered, that the defendant (*Winter*) should, within 40 days after service of a copy of the decree, execute a release, to be settled by the master, to *Mary* and *Henry Green*, in fee, of all the lands which have been conveyed to, or held by him in trust, except the lands which had been sold by him, and the proceeds charged to him in the master's report, of the 1st of *April*, 1815; and *M.* and *H. Green* to hold the same, in trust, according to the deed from *P. Heatley* to Mrs. *Green*, of the 8th of *August*, 1806, &c. And that the defendant, (*Winter*,) at the same time, assign all bonds, mortgages, contracts, &c., in his power, relative to his trust; and that he be examined on oath, touching the same, before a master, if required; and that the defendant, within the same time, pay the balance of moneys due on the master's report to *M.* and *H. Green*, with interest thereon, from the date of the report, and the costs of suit, &c.

By the report of the master, of the 8th of *February*, 1813, it appeared, that *Winter* was allowed a deduction, or credit, among others, for a sum charged against him in the report of referees, of 1,000 dollars, being the proceeds of the sale of the lot of land to *Ballou ;* and, after making all the deductions as directed by the order of reference, he reported the sum of 20,510 dollars and 1 cent, due from *Winter* to the plaintiffs, *W.* and *T. Green.*

*Gold,* for the plaintiff.

*N. Williams,* for the defendant, *Ballou;* and *J. Kirkland,* for the defendant, *Hunt.*

*For the plaintiff,* it was contended, 1. That *Hunt,* as assignee of *Winter,* as to the bond and mortgage, must stand in his place, and be subject to the same equity. (*Clute* v. *Robinson,* 2 *Johns. Rep.* 612. *Runyan* v. *Mercereau,* 11 *Johns. Rep.* 534. *Davies* v. *Austen,* 1 *Vesey,* jun., 249.

1815.    *Matthews* v. *Wallroyn*, 4 *Vesey*, jun. 118. *Sugden's. Law*
MURRAY   *of Vend.* 482.)
v.            2 That the *pendency of the suit* of *Green* and others,
BALLOU.  *cestuy que trusts*, against *Winter*, since the 30th of *June*,
1809, with the successive orders of injunction, must operate
as notice, and protect the subject matter from all prejudice,
from alienations by the trustee. (*Walker* v. *Smalwood*,
*Ambler*, 676. *Selfe* v. *Madox*, 1 *Vern.* 459. *Preston* v.
*Tabbin*, *id.* 286.    *Finch* v. *Newnham*, 2 *Vern.* 216.
*Garth* v. *Ward*, 2 *Atk.* 174. *Worsley* v. *Scarborough*,
3 *Atk.* 392. *Sugden's Law of Vend.* 494.)

3. The registry of *Scott's* original deed to *William*
*Green*, and of *Green's* mortgage to *Heatley*, in 1795, amounts
to a *constructive notice* of the rights of the *cestuy que trusts*.
The registry is notice to all the world ; and the *recital* in
the deed of *Winter's* trust, and the release of *Heatley* to
*Green*, is notice of the instrument recited from the registry.
(*Johnson* v. *Stagg*, 2 *Johns. Rep.* 510. *Jackson* v. *Neely*,
10 *Johns. Rep.* 374.)

4. The rights of the *cestuy que trusts* being protected by
the *lis pendens*, the premises alienated to *Ballou*, by the
trustee, still belong to them ; or, if they should so elect,
they may demand the proceeds of that sale.

*For the defendants*, it was contended, 1. That the de-
fendants had no actual knowledge of the pendency of the
suit at the time of the purchase ; and if chargeable with
notice at all, it must be an implied or constructive notice.
It cannot be denied, that the general doctrine, as to *implied*
*fraud*, though unknown to the common law, has been adopt-
ed in the courts of equity in *England ;* yet, even there it
has been received with reluctance, and with a manifest lean-
ing against it, as an extremely hard rule. (*Sugden's L. of*
*Vend.* 495. 2 *Vesey*, jun. 454. 3 *Atk.* 238.)    The
greatest man that has presided in the *English* chancery,
(Lord *Hardwicke*,) says, " a *lis pendens* is only a general

notice of an equity to all the world, but cannot affect any particular person with a *fraud*, unless there was *special notice* of the title in dispute there, to that person." (3 *Atk.* 243.) Now, *Ballou* is charged with a *fraud*, in purchasing property which he *knew* did not belong to the vendor.

1815.

MURRAY
v.
BALLOU.

Since the general rule of the *English* chancery, as to *lis pendens*, operates so injuriously to purchasers, it may well be doubted, whether, in this country, where landed property is in so different a situation, it ought to be adopted; unless perhaps, it has already become the established law of this court, of which there is no evidence. At any rate, the hardship of the *English* rule might be mitigated, even on principles to be found in the *English* books ; that is, this *implied notice* to a purchaser should point, directly and unequivocally, to the object of the purchase, so as to bring into question the *very title* to that object, and not as to *collateral matters* relating to the object or estate, such as *accounts, misapplication of trust moneys, or abuse of complicated powers and trusts.* (See *Worsley* v. *Scarborough*, 3 *Atk.* 392.)

Again, it may be observed, in this case, that the *cestuy que trust*, for whom so much is claimed, has been guilty of great negligence, *pendente lite.* After a discovery of the abuses of the trust, in 1809, a bill was filed ; but the first step taken to remedy or redress the abuse was in 1812, when a *receiver* was appointed. And what measures were taken by the *receiver ?* Did he attempt to ascertain the purchasers, and endeavour to rescue them, and the money, from an artful and fraudulent trustee, who had been an acknowledged and authorized agent of this extensive estate for so many years ? If the defendants, upon a technical rule of the court, are to be charged with constructive fraud, or neglect, in not taking notice of the pendency of a complicated suit, the plaintiffs have been guilty of gross negligence in not detecting the abuses of their own agent, and averting their effects. Had

they used due diligence, this money might have been saved to them.

2. Although the rule be admitted, that a purchaser is bound to take notice of the contents of registered deeds, relating to his title, yet the *cestuy que trust* has been negligent in not having the declaration of trust recorded. At most, the defendants could only be chargeable with notice of the trust, and not of the abuses of power, or fraud, which took the plaintiffs, and the court, five years to discover and redress.

As to the defendant, *Hunt*, he stands before the court as a *bona fide* assignee, or purchaser, of the bond and mortgage, without notice of any defect in *Winter's* title or authority; nor is there any pretence that he knew of the conduct of *Winter*, in relation to the trust. He is, therefore, entitled to be protected, as far as the rules of law, or the principles of equity, will permit. (2 *Atk.* 8. *Ambler*, 764. 282. 2 *Vesey*, jun. 458. *Sugden's Law of Vend.* 545.)

But, in fact, the plaintiffs have no concern with *Hunt*, who may be considered as a mere conduit for the money which passed between *Ballou* and *Winter*, the vendor and vendee. When *Hunt* took an assignment of the bond and mortgage, and paid the amount to *Winter*, it was precisely the same as if *Ballou* had paid the money. This transaction did not affect the subject matter of the trust. If, as the plaintiffs contend, the sale to *Ballou*, by *Winter*, was in violation of this trust, then nothing passed to *Ballou;* and if the sale did not bind the *cestuy que trusts*, they could not compel *Ballou* to fulfil the contract. If an agent make a sale to a *bona fide* purchaser, which is not binding on the principal, it is not in the power of the principal to affirm or annul the bargain at his own pleasure. The contract must be reciprocal. If the plaintiffs demand the proceeds of the sale from *Hunt*, they affirm its validity. If they seek to annul the contract of sale made by *Ballou*, they can have no claims upon *Hunt*.

Again, it does not appear, from the pleadings or documents, that the plaintiffs could give a title for the land, if *Hunt* should be decreed to pay them the money.

*Hunt* denies all notice of the abuse of trust in *Winter*, or of the defect in his power. The change of security, afterwards, cannot vary his situation, or affect his rights, in regard to the plaintiffs. The doctrine of the *lis pendens* has no application to him.

The principle of law, that you may waive the *tort* and, go for the proceeds of the sale, cannot be extended to a person in the situation of *Hunt.* All the cases to be found are those in which actions are brought against the person who wrongfully converted the goods, or against a purchaser who had converted them, after notice, or a demand from the owner ; not against a *bona fide* purchaser, into whose hands a chattel, which has been wrongfully converted, has passed, without any notice or demand by the right owner.

THE CHANCELLOR. The purchase, by *Ballou*, of *Winter* was made in *August*, 1810. The lot purchased was held, at the time, by *Winter*, in trust, for *Temperance Green ;* and a suit was then, and for a year preceding, had been, pending in this court by Mrs. *Green* against *Winter*, charging him with a breach of trust, and praying that his authority, as trustee, might cease ; and an injunction had been issued and served, enjoining him from any sale, disposition, or use of any of the lands or securities held by him in trust. The plaintiff, *Murray*, was, afterwards, appointed receiver, with authority to sue ; and upon a reference and report, which took place in the progress of the suit, *Winter* was found in arrear to the amount of 20,510 dollars ; and the amount of the above sale to *Ballou*, as being invalid and not binding on the *cestuy que trust*, was not allowed as a charge to *Winter.* By the final decree, *Winter* was ordered to convey and surrender to *Mary Green* and *Henry Green*, the

*1815.*

MURRAY
v.
BALLOU.

persons for that purpose appointed by Mrs. *Green*, all the property and interest whatever held by him in trust.

The suit so commenced against *Winter*, having been in a course of continued and diligent prosecution, and having been finally conducted to a decree by which the charges in the bill were established, a question arises, and has been discussed in this case, whether the purchase by *Ballou*, of part of the trust property, *pendente lite*, is binding on the *cestuy que trust?*

*Ballou* has, in his answer, denied any knowledge of the suit at the time of his purchase. There is no proof to contradict the answer, and it is to be taken for true. But though he had no knowledge of the suit, it is not pretended that he was ignorant of the existence of the trust; and it is to be presumed, from his silence, that when he purchased from *Winter*, he knew that *Winter* held and sold the land, not in his own right, but as trustee. The bill charges, that it was generally known, at the time of the sale, that *Winter's* authority was questioned. The answer goes no further than to deny any knowledge of the chancery suit, or of the injunction, or of any suspension or defect of power in *Winter* to sell. The answer of *Hunt* is to the same limited extent; and the probability is, that it was a matter of public notoriety at the time, that *Winter* held the large real estate in his possession as a trustee.

It has been said by the counsel for the plaintiffs, that *Ballou* was chargeable with notice of the trust, by means of the registry of the deed from *Heatley* to Mrs. *Green*, which recited the declaration of trust executed by *Winter*. This deed, containing this recital, was registered on the 9th of *April*, 1810, but I cannot perceive any justice in obliging *Ballou* to take notice of the contents of that deed. By what clue was he to be directed to look into the deed from *Heatley* to Mrs. *Green?* He was dealing with *Winter*; and supposing *Winter's* trust to be, otherwise, totally unknown to him, he might as well be required to examine the contents of every

deed on record. If there had been any deed on record to which *Winter* was a party, he would have had a specific object and guide for inquiry ; *cœca regens filo vestigia.* I have, therefore, not thought it reasonable to charge *Ballou* with a knowledge of the existing trust, by reason of the registry of *Heatley's* deed, but rather to infer that knowledge from what is charged in the bill, and from the silence and the strong implied admission in the answer. The inference from the answer is decisive. If a party means to defend himself, on the ground that he was a *bona fide* purchaser for a valuable consideration, without notice of a trust, he must deny the fact of notice, and of every circumstance from which it can be inferred. (*Bodmin* v. *Vandenbendy*, 1 *Vern.* 179. *Anon.* 2 *Vent.* 361. 3 *P. Wms.* 244. n. 2 *Vesey*, jun. 458. 9 *Vesey*, jun. 32.) And if notice of the trust existed when the purchase was made, then the general rule is, that the purchaser becomes himself the trustee, notwithstanding any consideration paid ; (*Saunders* v. *Dehew*, 2 *Vern.* 271. 2 *Fonb.* 152, 153. ;) and, though he may not, perhaps, be bound, in most cases, if the sale is fair, to look to the application of the moneys, yet, if the trust be suspended by process of the court, and the sale be made, as it was here, in contempt of that process, the purchaser, with notice, ought not to be allowed to defeat it. The question of notice of the trust is also material, inasmuch as the purchaser's knowledge of it goes to lessen or destroy the hardship, if any there should be, in the application of the maxim, *caveat emptor.* If every man purchases at his peril, and is bound to look to the title and the competency of the seller, the duty is the stronger, if he knowingly purchases of one acting as agent or trustee for others, for then he is bound to look into the validity and the continuance of the authority, and to call for an explanation of the nature and existing circumstances of the trust.

But it will not be necessary to rest the cause on this ground. The other point, which has been pressed for consideration,

appears to be altogether conclusive. Admitting that *Ballou* had no knowledge, in fact, of the suit of Mrs. *Green* against *Winter*, when he made the purchase, he is, nevertheless, chargeable with legal or constructive notice, so as to render his purchase subject to the event of that suit. The established rule is, that a *lis pendens*, duly prosecuted, and not collusive, is notice to a purchaser so as to affect and bind his interest by the decree; and the *lis pendens* begins from the service of the *subpœna* after the bill is filed.

The counsel for the defendants have made loud complaints of the injustice of this rule, but the complaint was not properly addressed to me, for if it is a well-settled rule, I am bound to apply it, and it is not in my power to dispense with it. I have no doubt the rule will sometimes operate with hardship upon a purchaser without actual notice; but this seems to be one of the cases in which private mischief must yield to general convenience; and, most probably, the necessity of such a hard application of the rule will not arise in one out of a thousand instances. On the other hand, we may be assured the rule would not have existed, and have been supported for centuries, if it had not been founded in great public utility. Without it, as has been observed in some of the cases, a man, upon the the service of a subpœna, might alienate his lands, and prevent the justice of the court. Its decrees might be wholly evaded. In this very case, the trustee had been charged with a gross breach of his trust, and had been enjoined by the process of the court, six months before the sale in question, from any further sales. If his subsequent sales are to be held valid, what temptation is held out to waste the trust property, and destroy all the hopes and interest of the *cestuy que trust?* A suit in chancery is, in such cases, necessarily tedious and expensive, and years may elapse, as in this case, before the suit can be brought to a final conclusion. If the property is to remain all this time subject to his disposition, in spite of the efforts of the court to prevent it, the rights of that helpless portion of the commu-

nity, whose property is most frequently held in trust, will be put in extreme jeopardy. To bring home to every purchaser the charge of actual notice of the suit, must, from the very nature of the case, be in a great degree impracticable. The only safe and efficient means of preventing such fraud and injustice, is to charge the purchaser with dealing with the trustee at his peril. The policy of the law does, in general, cast that peril upon the purchaser. *Caveat emptor*, is the settled maxim of the common law. It is his business to inquire and to look to the person with whom he deals. If he knows him to be a trustee, then let him inquire of the *cestuy que trust*, or let him ask at the register's office, whether there be any suit pending against such trustee. He can always be safe if he uses due diligence ; but the other party has no means of safety beyond his application to the court. Whatever may be thought of the rule, it appears to me to be less severe than that acknowledged rule of the common law, on which our courts have repeatedly acted, that a conveyance of land, without any warranty or covenant of title, will not enable the purchaser to resort back to the seller, even if the title should fail ; (*Frost* v. *Raymond*, 2 *Caines' Rep.* 188. ;) and if he has covenants to secure his title, he can seek for no more than the consideration which he has paid, without any allowance for the rise in value of the land, or the value of the improvements. (*Pitcher* v. *Livingston*, 4 *Johns. Rep.* 1.)

I have said that the *lis pendens* was, of itself, notice to the purchaser, and it will now be proper to show that this rule is well established in our law. It is no more than an adoption of the rule in a real action at common law, where, if the defendant aliens after the pendency of the writ, the judgment in the real action will overreach such alienation. It was one of the ordinances of Lord *Bacon*, laid down *for the better and more regular administration of justice in the court of chancery*, that, " no decree bindeth any that cometh in *bona fide*, by conveyance from the defendant, be-

fore the bill exhibited, and is made no party, neither by bill nor order : but where he comes in *pendente lite,* and while the suit is in full prosecution, and without any colour of allowance or privity of the court, there regularly the decree bindeth." (Lord *Bacon's* works, vol. 4. 511.) Here we find the rule declared above two centuries ago, and by the highest authority to which we can appeal; and it will appear to have received support and application down to this day. In the case of *Martin* v. *Stikes,* (cited by Lord *Nottingham,* in his *Prolegomena of Equity,* and, again, in 11 *Ves.* 200.,) the bill was filed in 1640, and was abated, by death, in 1648 ; and a bill of revivor was filed in 1662, and the purchase was made in 1651, and yet, as the purchase was, by relation of the bill of revivor ; made *pendente lite,* the purchaser was held bound, and by no less a character than Lord *Clarendon.* I cite this case, not with approbation, but merely to show the great extent to which the rule has been anciently carried. When this very case was, afterwards, in a new shape, brought before Lord Keeper *Bridgman,* (1 *Cas. in Ch.* 150.,) he observed, that it was not *form,* but the substance of a decree, that all are bound by it who come in, *pendente lite.* The case of *Culpepper* v. *Austin,* which was a few years subsequent, (2 *Ch. Cas.* 115. 221.,) is a strong determination on the same point : in that case the testator had conveyed his lands to his executors, in fee, to pay his debts ; and after his death the defendant purchased the lands of the executors for a valuable consideration. The heir brought his bill, to have the land, on the ground that the lands were not wanted to pay debts ; and the Lord Chancellor held, that the suit pending between the heir and the trustee, to have an account, was sufficient notice, in law, without actual notice of the suit, and the party purchased at his peril ; so that if, in the event of the suit, it appeared that the sale was unnecessary and improper, the heir would recover against the purchaser. It turned out, afterwards, that the defendant lost his purchase, though he

had no actual notice of the suit, and though he had pur- chased and paid the same day the bill was exhibited. (*Vide*, as to this result, what was said by the *Chancellor* in *Baens* v. *Canning*, 1 *Ch. Cas.* 301.) The case of *Fleming* v. *Page* and *Blaker* arose during the time of Lord *Notting-ham*, (*Rep. temp. Finch*, 321.) These were purchases made by the defendants for a valuable consideration, but they were made *pendente lite*, and for that reason the pur-chasers were decreed to reconvey and deliver up the wri-tings. The same general principle, that all persons who come in as purchasers, *pendente lite*, though they are no parties to the suit, they and their interests shall be bound and avoided by the decree, is laid down as the known law, in several cases to be found in *Vernon*, and to which it will be suffi-cient only to refer. (*Preston* v. *Tubbin*, 1 *Vern.* 286. *Anon.* 1 *Vern.* 318. *Goldson* v. *Gardner*, cited in *Self* v. *Madox*, 1 *Vern.* 459. *Finch* v. *Newnham*, 2 *Vern.* 216.)

If we come down to more modern times, when the prin-ciples of equity may be supposed to have been more high-ly cultivated, and more precisely defined, we shall find the rule recognised with equal force. Thus, in *Sorrel* v. *Car-penter*, (2 *P. Wms.* 482.,) the defendant purchased an estate, *pendente lite*, from one *Ligo*, after subpœna served on *Ligo*, and before answer, for the full value, and without any notice of the plaintiff's title, or actual notice of the suit. This was the strongest case that could be imagined, and under circumstances far more favourable to the purchaser than the present ; and Lord Ch. *King* said, that it was a very hard case to set such a purchase aside, yet he admitted that such was the rule, and that it was taken from analogy to alienations pending a real action at law. This doctrine came frequently under the review of Lord *Hardwicke*, and he al-ways held that a purchaser, *pendente lite*, was bound by the decree in the suit. The pendency of the suit was, of itself, notice; and he observed, that the rule was to prevent a greater mischief that would arise by people's purchasing a right under

1815.

MURRAY
v.
BALLOU.

1815.

MURRAY
v.
BALLOU.

litigation. (*Garth* v. *Ward*, 2 *Atk.* 174. *Worsley* v. *Scarborough*, 3 *Atk.* 392.) Lord *Camden*, afterwards, enforced the same rule. "I hold it," he said, "as a general rule, that an alienation pending a suit is void." (*Walker* v. *Smalwood, Amb.* 676.) I shall conclude this view of the *English* authorities with noticing the observations of the Master of the Rolls in the case of *The Bishop of Winchester* v. *Paine*, (11 *Ves.* 194.) "He who purchases during the pendency of the suit, is bound," says Sir *William Grant*, "by the decree that may be made against the person from whom he derives title. The litigating parties are exempted from the necessity of taking any notice of a title so acquired. As to them it is as if no such title existed. Otherwise, suits would be interminable, or, which would be the same in effect, it would be in the pleasure of one party at what period the suit should be determined. The rule may sometimes operate with hardship, but general convenience requires it."

It would be impossible, as I apprehend, to mention any rule of law which has been established upon higher authority, or with a more uniform sanction ; and I should have thought it necessary to apologize for wasting so much time on the point, if I had not found the rule, ancient and stable as it is, questioned and resisted by plausible considerations addressed to the feelings. I may, also, be permitted to add, that as I am without the aid of any public reports, or any distinct knowledge of the decisions of this court during the time of my predecessors, I am obliged, in almost every case, to re-assert, expound, and vindicate the principles of our equity jurisprudence. Many a point is now raised which would, probably, never have been disturbed, if the means had been afforded to learn the doctrines of the court; and it cannot be too often repeated, and too deeply impressed, that established principles in equity can no more be dispensed with than the rules of law, and for this plain reason, that I am not clothed with a dispensing power.

The persons in whose behalf this suit was instituted are, consequently, entitled to a conveyance of the land sold to Ballou, equally as if the title had remained in *Winter*. The suit is, also, against *Hunt*, the assignee of the bond and mortgage given by *Ballou;* and the counsel for the plaintiffs seek either the land or the proceeds of the sale, and appear to be equally willing to accept of either. *Hunt* purchased the bond and mortgage, as he says, without knowing or inquiring as to the consideration for which they were given ; and though he took them subject to all the equitable claims of *Ballou*, yet, as between him and the *plaintiffs*, the question may not be the same ; and I think it will be unnecessary for me to decide, at present, whether the doctrine of this case reaches him, so as to protect from assignment all the bonds and other securities taken by *Winter* in his character of trustee.

This point underwent much discussion in the house of lords, in *Redfearn* v. *Ferrier and others ;* (1 *Dow's Rep.* 50. ;) and it was there held, on appeal in a *Scotch* case, that a latent equity, in a third person, shall not defeat a *bona fide* assignee of a right without notice, except it be an assign- ment by an executor, which carried on the face of it notice of his fiduciary character.   (See p. 54. 59, 60. 66. 72.)

The claim raised by the bill against *Ballou*, for the land, and against *Hunt*, for the proceeds of the sale, are inconsist- ent with each other ; for the one annuls, and the other affirms, the sale.   The claim to the land is clear of all difficulty, and comes within all the cases ; and the only use I shall make of the demand in the alternative, for the lands or the pro- ceeds, will be to relieve *Ballou* as far as it is possible from the loss of his improvements, by giving him the alternative, to convey the land, or keep the land, and pay the amount of the consideration he gave, together with the interest thereon.

I shall, accordingly, decree, that the defendant, *Ballou*, within 40 days from the service of a copy of the decree,

convey, in fee, the lot in question to *Mary Green* and *Henry Green*, to be held by them, in trust, &c. unless he shall, within that time, elect to pay, and actually pay, or tender, to the said trustees, the amount of the bond he gave to *Winter*, with interest thereon, to the date of this decree.

As *Ballou* is not charged with actual, and only with constructive, notice of the suit, here is no real fraud in the case; and though the purchase cannot be permitted to stand, there is equity in not carrying the doctrine of constructive notice in this case so far as to charge him with costs. I shall, therefore, not award costs to either party, as against the other; and the bill, as to the defendant, *Hunt*, must be dismissed. But as there was probable ground for bringing him into court, and as he has no more real equity to protect him than the other defendant, I shall dismiss the bill, as to him, without costs.

Decree accordingly.