[Commonwealth ex rel. Smith et al. *v.* Dieffenbach et al.]

# CASES AT NISI PRIUS.

## Commonwealth ex rel. Smith et al. *versus* Dieffenbach et al.

1. If judgment of ouster and exclusion be given against defendants, execution shall be had by writ of injunction, and obedience thereto may be compelled by attachment and sequestration.

2. If a decree in equity requires the delivery of possession of lands, and the lands be within the jurisdiction of the court, and defendants refuse to perform the decree, the court will enforce it by a writ of assistance directed to the sheriff.

3. A writ of assistance is an incident to an injunction and to a sequestration, and is issued whenever it becomes necessary to enforce either.

4. The practice of the United States Courts in equity, both by act of assembly and rule of court, has become the practice of this court.

5. The writ of assistance is so much a matter of course, that the prothonotary may issue it in the cases prescribed by the rule (9 of Supreme Court in equity) without any application to the court.

6. Ordinarily, the decree of the court binds only the parties to it; but he who purchases during the pendency of the suit is bound by the decree that may be made against the person from whom he derives title.

At NISI PRIUS, *coram* LEWIS, J.

The facts fully appear in the opinion delivered May 5th, 1854, by

LEWIS, J.—This is a motion by Ignatius Steinmetz and Peter Fasel, in the nature of an application by each for an examination *pro interesse suo*, in order that their several interests may be protected, and the writ of assistance discharged as to them.

A brief history of the case as it stands upon the record, may be necessary to a proper understanding of the merits of this motion. A dispute had existed for some years respecting the manner of conducting the elections of trustees, and the right to possession, under the charter of 4th October, 1788, of the house of worship and the buildings appurtenant, belonging to the Church of the Holy Trinity, at the corner of Sixth and Spruce Streets. According to the primary meaning of the word "*lis*," as given by Mr. Justice LAWRENCE in the *Berkeley Peerage Case,* 4 Campbell, 411, we might hold that there has been a *lis pendens* for several years past, in which the claims of the respondents in the present *quo warranto* have been denied.

But we go no further back with the dispute than the present proceedings. On the 3d of June, 1853, a suggestion was filed

[Commonwealth ex rel. Smith et al. *v.* Dieffenbach et al.]

in the court, setting forth that Henry Dieffenbach, William Steinmetz, John George Fisher, George Langolf, Adam Spiel, Lewis Thomas, Reme Feigel, and Joseph Ruch were usurping and illegally exercising the offices and powers of lay trustees of the religious society of German Roman Catholics, of the church called the Holy Trinity. On the same day a writ of *quo warranto* was allowed and issued. The answer was filed on the 12th November, 1853. On the 22d March, 1854, after a trial before the Hon. George W. Woodward, one of the Justices of the Supreme Court, a verdict was rendered, which decided that neither of the parties claiming to be trustees had been legally elected, and that the defendants were usurping powers which did not belong to them. On the 25th March, 1854, a judgment of ouster was solemnly pronounced against them, according to the decision of the jury, and on the 27th March, 1854, the court appointed Frederick Horsemann and others trustees to take charge of the church building and property until others could be legally elected.

On the 1st April, 1854, after a hearing under a rule to show cause, an injunction was granted by the court, commanding the defendants to deliver to the trustees appointed, the books, papers, and properties of the church. On the 4th April, 1854, on proof of service of the injunction and disobedience of it, the court granted a rule to show cause why an attachment should not issue. On the 8th of April, 1854, the defendants answered that they *did not intend to appear or answer to the rule granted on the 14th instant!* As this was not accepted as an excuse for disobeying the injunction, they were immediately committed to prison for the contempt.

All these proceedings took place before Judge Woodward, who was then holding the Nisi Prius Court.

I know nothing of the merits of the case, nor of the justice of the decision; but I perceive that there has been a trial by jury, in due form of law, before a competent tribunal; and that it has been determined by the court and jury that the defendants, Henry Dieffenbach and his associates, are usurpers; and that judgment has been solemnly pronounced in due form of law, that they be ousted and altogether excluded from the offices of trustees of the church. I perceive, also, that an injunction has been issued by the same competent tribunal, commanding the defendants to deliver up the church properties to the persons appointed by the church to receive them, and that the defendants are in prison under a commitment for their contempt, in refusing to obey this injunction. These proceedings remain unreversed. It is not in my power to reverse them. That can be done by the Supreme Court alone. In the mean time, every good citizen is bound to observe the rules of law and order,

VOL. III.—24

[Commonwealth ex rel. Smith et al. *v.* Dieffenbach et al.]

and to submit to the judgment, until it can be reversed in the mode known to the law. It became my especial duty, on taking the place of the judge who pronounced it, to make all orders, and award all process necessary to carry it into execution. The law is not to be reproached with the folly of pronouncing a judgment which the parties may regard as a nullity or not at their pleasure. The execution follows the judgment.

By the act of 14th June, 1836, regulating proceedings on' writs of *quo warranto,* it is provided that if judgment of ouster and exclusion be given against the defendants, execution shall be had by writ of injunction, and obedience thereto may be compelled by attachment and sequestration, in like manner as in other cases of injunction. The writ of injunction is the peculiar writ of a court of chancery, and the proceedings of that court are ordinarily merely *in personam.* 10 Vesey, 164; 2 Dessaussure, 275; 6 Cranch, 158; 1 Henning & Munford, 5. But if the decree requires the delivery of the possession of lands, and the lands be within the jurisdiction of the court, and the defendants refuse to perform the decree, the court will enforce it by a *writ of assistance,* directed to the sheriff. 1 Ves. Sr. 444; 3 Atk. 275; 1 Atk. 543; 3 Atk. 587; Fonbl. Equity, 34, n. 9; 1 Danl. Ch. Prac. 646; 1 Swans. 457. This writ is an incident to the injunction and to the sequestration, and is issued wherever it becomes necessary to aid in enforcing either. By the act of 16th June, 1836, it is provided that "in every case where the court exercises the power of a court of chancery, the same may be exercised according to the practice in equity, prescribed or adopted by the Supreme Court of the United States, unless it be otherwise provided by act of assembly, or the same shall be altered by the Supreme Court of this commonwealth, by general rules and regulations." The practice of the United States courts has not been prohibited either by rule of court or act of assembly in this respect. The power given to enforce obedience by attachment and sequestration, has relation to decrees *in personam,* and does not exclude the usual and necessary means of enforcing proceedings *in rem.* On the contrary, the practice of the United States courts, both by act of assembly and by rule of court, has become the practice of this court. By rule nine of the practice in equity in the United States courts, it is provided that "when any decree or order is for the delivery of possession," upon proof of demand and refusal to obey, "the party prosecuting the same shall be entitled to a writ of assistance from the clerk of the court." The ninth rule regulating the practice of the Supreme Court of this State, in equity, is substantially in the same language. The writ of assistance is so much a matter of course, that the prothonotary may issue it, in the cases prescribed by the rule, without any

application to the court. But in this case application was made in open court, and upon argument and due proof that demand had been made, and the defendants had refused to deliver possession of the real estate appurtenant to the church edifice, and necessary to its proper use and engagement. A writ of assistance was awarded on the 15th April, 1854, commanding the sheriff to deliver possession to the trustees appointed to receive it. Motions were subsequently made with a view to enforce the execution of this writ. On these occasions it was repeatedly stated in open court from the bench, that if any person had interests which ought not to be affected by these proceedings, they had a right to an examination touching their interests, and that all rights and estates which ought to be preserved from the operation of the writ of assistance, when duly shown and established, would be protected. For the purpose of giving time to the persons claiming to be tenants to come into court and move for an examination *pro interesse suo*, the proceedings of the sheriff were stayed as often as application was made for the purpose. And at last, on the 2d May, 1854, Ignatius Steinmetz and Peter Fasel appeared and claimed to hold possession of portions of the church property under alleged leases granted by the persons whose right to act as trustees has been decided to be invalid. The lease to Ignatius Steinmetz is dated the 29th October, 1853. It is signed by two persons, who claim to be president and secretary, and the corporate seal is annexed. By this lease, if valid, Mr. Steinmetz is entitled to hold the premises until the 31st October, 1856, a period of three years. In opposition to this claim it is established by the testimony, *and not contradicted by any evidence whatever*, that the house leased to Mr. Steinmetz is the building erected on the church lot adjacent to the church building, for the residence of the priest, and that until the recent difficulties arose, it had "always been occupied as the pastor's residence."

Peter Fasel claims under a lease dated 1st February, 1853, which, from its terms, was but a lease from year to year. It expired on the 1st February last. But possession is claimed for another year, under a contract supposed to be implied from an omission to give notice to quit.

Whether this contract by implication be supposed to' arise on the 1st of February, 1854, or three months previously, it is not material to inquire, as in either case it originated *while the suit was pending*. The rooms claimed by Mr. Fasel are four rooms in the upper story of the school-house, used in connection with it, and erected on the lot on which the house for worship stands. It is shown by the testimony, that the entrance to Mr. Fasel's rooms is through the school-house belonging to the church, and that there is a room up stairs in the

school-house in which " the vessels, vestments, and 'all things used at mass are kept, and that there is no other way to get to this room but by passing through the room Fasel lives in." On the cross-examination it was admitted by one of the witnesses, that the articles *in every day use* were generally kept in the church; so that the room up stairs in the school-house seems to have been appropriated to the preservation of such sacred articles connected with religious services as were used only on extraordinary occasions.

These are the facts of the case, as fully established in open court by evidence offered by the parties. The same facts might have been established by an examination of the tenants under oath, upon interrogatories to be framed by the relators, or by reference to the master; or in a proper case, the court might give the claimants leave to try their titles at law, either by ejectment, or in such other manner as might be necessary for the purpose of deciding the point. 1 Daniel's Chanc. Prac. 644. But as neither party proposed an examination of the tenants upon interrogatories, or a reference to a master, but each proceeded to exhibit his evidence, I deem it more satisfactory to the parties to proceed at once to the hearing of the motion, and I now deliver my judgment upon it.

It is clear, from the testimony, that the buildings occupied by Steinmetz and Fasel respectively, were. erected for purposes connected with religious worship, instruction, and clerical duties. The society was incorporated for these purposes, and had no right to erect buildings for any other. It does not appear that either Fasel or Steinmetz are occupying the premises for any of these purposes. If they were, it was their business to show it. As every one is presumed to make the best statement of his case which its nature admits of, the omission to set forth any such pretension, leaves their claims open to the presumption that they are occupying the buildings for objects entirely foreign to their appropriate uses. From the character and location of the buildings, their known uses, and the general duties of trustees of a religious corporation, the latter, even if legally elected, had no right to leave them out, except for the purposes for which they were designed, subject and in strict subordination to these paramount rights. But the words of the charter are too clear on this subject, to admit of hesitation or doubt. The trustees can have no powers except those granted by the charter. That instrument, in clothing them with powers to demise the real estate, expressly *excepts from the operation of the power,* " the said church,. called the Holy Trinity, and *the lot of ground and appurtenances thereto belonging, or therewith now used and occupied.*" The wisdom of this exception is apparent. Its design was to prevent the lay trustees

from making any contract whatever which would interfere with the religious purposes for which these buildings were erected. To lease them for other purposes was a breach of trust, and those who took leases with a knowledge of the nature of the property and of the trust, participated in the act of bad faith, and must abide the consequences. The school-house and the priest's house are on "*the lot of ground*" on which the church edifice stands, and it is plain that they have been and ought to be "used therewith." They could not be leased for a term of years at all, because such a lease might interfere with the religious uses for which they were built. But in no event were the trustees, even if legally elected, justified in leasing them for dwelling-houses, lawyers' offices or mechanics' workshops. Even if the parson's house and the school-house may be leased out for secular purposes, I see no reason why the main building—the church itself—might not be let out for a lager beer establishment. But such a profanation could not be tolerated for a moment. When a similar one was perpetrated in the time of the Saviour, it was not thought necessary to await the tedious process of the law to eject the intruders; they were driven out with a "scourge," their money "poured out," and "their tables overturned." The only real objection to the present proceeding is, that the defendants and their tenants have been treated with unexampled forbearance and indulgence.

But conceding that the trustees had a right to lease the premises for secular purposes, this would not avail the tenants under the circumstances of this case. The persons from whom they derive title must now be taken to be usurpers, who never had any right to act as trustees. In judgment of law, *they were not the trustees at the time these leases were made.* It is true that the acts of an officer *de facto* are in general binding, so far as third persons are concerned. But this rule, like all other rules of law, is founded on reason. Where the people, or persons interested, permit any one to exercise the duties of an office without authority, it is more reasonable that those who have the right to dispossess him and neglect that duty and acquiesce in his acts, should be bound by them, than that innocent persons who transact business with him should suffer. But where the persons whose rights are invaded are using every means in their power to disposses the intruders, the reason does not apply. In that case the rule of *caveat emptor* must operate. Every purchaser must take care to deal with one that has a right to sell, or he should protect himself by proper covenants. "If he knows him to be a trustee, let him inquire of the *cestui que trust*, or let him ask at the register's office whether there be any suit pending against such trustee;" per Kent, Chancellor, 1 Johns.

Chan. R. 577. Before these leases were made the parties whose rights were intruded upon had issued and served their writ of *quo warranto.* That proceeding was not to determine a mere collateral matter which might not affect the title. It was a *direct denial of the title of the defendants, and its immediate object was to oust them, and to exclude them from the exercise of the offices into which they had intruded.* By the common law, all persons who purchased of the defendants pending such a suit would be bound to take notice of the suit, and would be affected by the judgment as fully as if made parties to the proceeding. The rule is the same in chancery. More than two centuries ago it was one of Lord Bacon's ordinances for the "better and more regular administration of justice in the court of chancery; that no decree bindeth any that cometh in *bona fide* by conveyance from the defendant, *before the bill exhibited,* and is made no party, neither by bill nor order; but where he comes in *pendente lite,* and while the suit is in full prosecution, and without any color of allowance or privity of the court there regularly, the decree bindeth." This rule has governed the court of chancery with unwavering uniformity, and the cases in which it has been enforced are almost without number. When Chancellor Kent, in *Murray* v. *Ballou,* 1 Johns. Ch. 580, entered into an examination of the authorities to show that "it was impossible to mention any rule of law which has been established upon higher authority, or with a more uniform sanction," his apology for "wasting so much time in the point" was the plausible considerations *addressed to his feelings.* There are no "plausible considerations" against the operation of the rule in this case. The nature of the dispute, and the notoriety of it, render it impossible to believe that the tenants had not actual notice of it. Indeed, it was proved that Fasel was the sexton under the usurping trustees; and neither Fasel nor Steinmetz have pretended, on oath or otherwise, to deny notice that the claim of the trustees from whom they leased was disputed and in litigation. But whether they had actual notice or not, the parties intruded upon did all in their power to dispossess the intruders by prosecuting the writ of *quo warranto;* and those who chose to take leases *pending that suit* are bound to take notice of it and are affected by the decree. We may be well assured that this rule would not have existed and been supported for centuries if it had not been founded in great public utility. Without it a man upon the service of subpœna might alienate his lands, and thus prevent the justice of the court. Its decrees might thus be wholly evaded. 11 Vesey, 200; 1 Cas. in Chan. 150; 2 id. 115; Rep. temp. Finch. 321; 1 Vernon, 286, 318, 459; 2 Vernon, 216; 2 P. Wms. 482; 2 Atk. 174; 3 Atk.

392; Ambler, 676; 4 Johns. Ch. R. 46; 1 Johns. Ch. R. 566; 2 Johns. Ch. R. 158; 2 Com. Dig. 718; Chancery, 4, c. 3.

In *Serrell* v. *Carpenter*, 2 P. Wms. 482, the defendant purchased an estate *pendente lite*, from one Ligo, *after subpœna served and before answer*, and he was held bound by the decree, although he paid full value, without any notice of the plaintiff's title, or actual notice of the suit. In the *Bishop of Winchester* v. *Paine*, 11 Ves. 197, Sir William Grant stated the rule to be that "ordinarily the decree of the court binds only the parties to it. But he who purchases *during the pendency of the suit is bound by the decree that may be made against the persons from whom he derives title.* The litigating parties are *exempted from the necessity of taking any notice of a title so acquired. As to them, it is as if no such title existed.* Otherwise, suits would be indeterminable, or, which would be the same in effect, it would be in the pleasure of one party at what period the suit should be determined." General convenience requires the adoption of the rule.

As the tenants in possession took their leases from persons who were not the legal trustees—as those contracts were not authorized by the charter under which all parties professed to act—and were made after the writ of *quo warranto* had been issued and served for the purpose of ousting the usurpers, and after the dispute in regard to their title to act as trustees had become so notorious that the tenants had not presumed to deny actual notice of the controversy; common sense unites with the established law in declaring that they are bound by the judgment which has been pronounced, until they can succeed in reversing it. They must therefore go out of possession with those from whom they derive their claim.

The motion of Ignatius Steinmetz and Peter Fasel to discharge the writ of assistance is overruled, and the sheriff is directed to execute the writ according to law, without further delay.