LILLIAN M. TURNER

*v.*

HENRY J. HOUPT and SARAH L., his wife.

1. False representations, knowingly made by a vendor to a vendee previous to the sale, as to the character, condition and value of the property, are presumed to have influenced the mind of the purchaser, even though he had full opportunity to observe and know the actual truth, and the burden is on the vendor to prove clearly that such false representations did not influence the vendee in making the sale.

2. The true test of mental capacity, whether to make a will or to transact business, is the ability "clearly to discern and discreetly to judge" of the matter in hand.

3. A higher degree of mental capacity is required to transact the business of an exchange of lands than to attend to the ordinary affairs of every-day life or to make a valid will.

4. The essence of the continuance of a *lis pendens* is that the object, subject-matter, ground of relief and parties should remain unchanged, except upon a devolution of the title from the complainant. An amendment which does not change either of these, but is a mere specification of additional matters of proof of the ground of recovery, i. e., fraud, does not make a new suit, even though the matter so set up becomes in the end the ground of recovery.

5. Complainant, by his bill, asked to recover in equity a piece of land from defendant, upon the ground that title thereto had been obtained from complainant by fraud practiced by defendant, specifiying the fraud. The defendant made a conveyance pending the suit to a third party, who had full notice of it. After conveyance, complainant amended his bill by adding other specifications of fraud of the same character, and upon proof of these latter specifications obtained a decree.—*Held*, that the maxim "*pendente lite nihil innovetur*" applies.

Turner *v.* Houpt.

6. Complainant, at a time when his mental faculties were weakened by disease, was induced, by false and fraudulent representations made by defendant, to convey to defendant a piece of land. Shortly afterwards, and after complainant had become mentally unfit to attend to business, his wife discovered what she supposed to be evidence of false and fraudulent representations made by defendant to her husband, and commenced a suit in chancery in his name to recover the land so conveyed, on the ground of fraud, specifying the matter which she discovered. A would-be purchaser from the fraudulent grantee of the land so conveyed, having notice of the suit, inquired into the specifications of fraud contained in the bill and satisfied himself that they were untrue, and, among others, inquired of the wife and learned from her only what was contained in the bill and also of the incapacity of her husband, and purchased the lands. Subsequently the wife discovered among her husband's papers evidence of other fraudulent representations, and caused the bill to be amended accordingly, and finally succeeded in setting aside the conveyance upon proof of the specifications of fraud contained in the amendment.—*Held*, that the complainant was not estopped by the answers made by the wife to the inquiries made by the expectant purchaser.

On bill, amended bill, and bill of review and answers.

*Mr. Frank P. McDermott, Mr. Robert S. Clymer* and *Mr. Kuhlemeier* (of Philadelphia), for the complainant.

*Mr. Lindley M. Garrison,* for the defendants.

PITNEY, V. C.

The object of the bill is to set aside an exchange of real properties made between Albert L. Turner, the original complainant, and the defendants on the last days of May, 1891.

By deed dated May 29th, 1891, Dr. Turner and his wife, the new complainant, Lillian M. Turner, conveyed to Henry J. Houpt a hotel called the Norwood inn, and some vacant building lots at Avon-by-the-Sea, Monmouth county; and by deed of the same date the defendants conveyed to Mrs. Turner a farm and woollen-mill property in Maryland, called the Mallalieu mill, the one conveyance being the consideration for the other.

The general allegation of the amended bill is that the defendant Houpt made false and fraudulent representations to Dr. Turner as to the quality, condition and quantity of land in the Maryland property, and that the doctor was at the time suffering

from mental disease to such an extent as to render him liable to
be imposed upon by such false and fraudulent representations,
and that he was imposed upon thereby.

The circumstances are peculiar and complicated, and the case
will be best understood by stating them somewhat *in extenso* and
in the regular order of time.

Dr. Turner was a physician, and practiced his profession up
to the year 1888. At that time he was, and had been for several
years, living in the city of New York. He had a fancy for real
estate operations, and was the owner of considerable real estate,
among others the hotel and vacant lots in question at Avon-by-
the-Sea, formerly known as Key East. He gave up the practice
of his profession in 1888, and also his permanent residence in
New York. At that time he spent his summers at Avon-by-the-
Sea and his winters in Florida. He spent the winter of 1890–91
in Florida, with his wife. In March of that year he went North
alone on business, and visited his sister in Connecticut. While
there he suffered a very severe attack of the grippe, which affected
his mind to some degree. He returned to Florida the latter part
of March and remained there with his wife until the latter part of
April. His physical health improved, but the disturbance of his
mind was noticeable by his wife and relatives, though not to per-
sons who were not acquainted with him or were not brought in
close contact with him. He returned to the North with his wife
in the latter days of April, 1891, stayed a few days in New
York city, and then took up his residence in Philadelphia. He
owned some real estate in the neighborhood of Philadelphia and
employed, as real estate brokers, a firm of Barrows & Bliss in
that city. Mr. Barrows is an elderly gentleman, past eighty
years old; Mr. Bliss is a younger man. He placed in their
hands for sale or exchange the Norwood inn at Avon-by-the-Sea.
At that time the defendant was the owner of the mill property
in question in Maryland, and had lived on it for at least a year.
He placed that property in the hands of a real estate broker in
Philadelphia by the name of Warbasse, for sale or exchange,
with a description of the property. About the middle of May
Mr. Warbasse met Mr. Barrows in the latter's office, and inquiries

Turner v. Houpt.

passed between them as to what either had for sale or exchange, and Mr. Warbasse mentioned to Mr. Barrows this Mallalieu property, and at Mr. Barrows' request wrote a description of it in these words:

"Farm of 400 acres, and a two-set woolen-mill, at Millington, Md., 69 miles from Philadelphia, 15 looms and 648 spindles and full set of the best machinery to correspond. Building 50 x 120, annex 20 x 40. Dye-house and engine-room attached. Farm of 400 acres, divided into fields of 40 acres each by hedge, wire and post fences. Land fine land, said to be as good a farm as there is in the state. Has 8,000 full-bearing peach trees, 9 tenant-houses, store, 17-room mansion; farmer-house and barn, stable and all necessary out-buildings in good order. The whole property is in good farming condition and is valued at $40,000. Less mortg. of $12,000 and one of $5,000, at 6 per cent."

This paper was shown to Dr. Turner by Mr. Barrows, and the result was an interview between Houpt and Dr. Turner, at Barrows' office, at which Mr. Houpt made further representations as to his property and its qualities. As to the cost, to wit, that the machinery in the mill had cost $30,000; that the property was rentable at a large rent, and that there was valuable iron ore and valuable marl upon it; and with regard to the incumbrances, that the first mortgage was for $12,000 or $12,500, and the second one was for $5,000 and given to secure a note which could remain and be renewed as long as $200 was paid at each renewal at the end of three months.

In pursuance of these representations, on the 21st of May, the parties entered into a written agreement in duplicate, in these words:

"PHILADELPHIA, May 21, 1891.

"This agreement made in the city of Philadelphia, the day and year above written, by and between H. J. Houpt, of the city of Philadelphia, of the one part, and Dr. A. L. Turner, of the city of Philadelphia, of the other part. Witnesseth, that the said party of the one part agrees to convey by deed unto the said party of the other part, all that certain farm and mill property known as the 'Mallalieu Mill Property' and situate on the road leading from Millington to Church Hill, about one mile from Millington, in Queen Anne county, State of Maryland, said property containing in all about 400 acres, and *more fully described in attached memorandum*, together with all the mill machinery &c. now on the place, and belonging to the said party of the one part; said property to be free and clear from any and all incumbrances, except the mort-

**34**

Turner *v.* Houpt.

gages, amounting in total to sixteen thousand and nine hundred dollars ($16,900) and title to be marketable; and the said party of the one part agrees to take from the said party of the other part, in full and complete payment for the above property, the hereinafter described property which the said party of the other part agrees to give, *i. e.*, all that certain property situate in Avon-by-the-Sea, county of Monmouth and State of New Jersey, known as the 'Norwood Inn,' and consisting of two lots of ground each 50 ft. by 140 ft. &c.  *  *  *  This agreement to be binding if each property is found to be, on examination, as described herein; and if the second mortgage on the farm and mill property can be arranged satisfactorily to the party of the other part; at the time of settlement, interest, taxes and insurance to be adjusted by each party. This agreement is binding upon the heirs and executors of each party.

                           "H. J. HOUPT.                          [L. S.]
                           "BARROWS & BLISS, for Dr. A. L. Turner. [L. S.]
"Witnesses—
        "E. H. Warbasse.
        "E. H. Warbasse."

Annexed to it at the time it was executed was the written description, previously given by Mr. Warbasse to Mr. Barrows, above set out. Dr. Turner was present, although his name was signed by Barrows & Bliss, and Mr. Warbasse was the witness.

Within a very few days Mr. Houpt, Dr. Turner and Mr. Barrows visited the premises in Maryland, and were on the ground between an hour and an hour and a half. Dr. Turner made a cursory examination of them. They then returned to Philadelphia and signed the following addition to the agreement of May 21st:

"The above-described properties have been accepted by both the parties named in this agreement.

                           "H. J. HOUPT.                          [L. S.]
                           "BARROWS & BLISS, for A. L. Turner. [L. S.]
"Witnesses—
        "E. H. Warbasse.
        "E. H. Warbasse."

And on the 29th the deeds were made and executed. No examination of the title, or for incumbrances, was made by Dr. Turner. Instead thereof he took an affidavit made by Mr. Houpt that the same was free of incumbrance, except $16,700.

That affidavit was made on the 30th of May, and the deeds were presumably delivered on or about that day.

Between the execution of the agreement and the execution of the deeds Mr. Houpt had renewed the note secured by the second mortgage and paid $200 upon it, thereby reducing the incumbrance that much.

Dr. Turner does not appear to have observed that the deed which he accepted, while not describing the farm by metes and bounds, did refer to the conveyances under which his grantors claimed, and that these conveyances called respectively for two hundred and sixty-four and a fraction acres, and six and a fraction acres, in all two hundred and seventy and a fraction acres; but upon subsequent visits to the farm he did discover that the representation with regard to the peach trees and the iron ore and the marl and the quantity of land was untrue, and he complained of it to Mr. Barrows.

Subsequently it was ascertained that a mistake had been made in the conveyance of the Avon property by Dr. Turner and wife to Mr. Houpt, and a reconveyance was made on the 30th of July from Houpt and wife to Dr. and Mrs. Turner, and a further reconveyance by Dr. Turner and wife to Mrs. Houpt, whereby the error was corrected.

Each party took possession of the premises and retained it.

Dr. Turner continued to fail in health. Early in September he made a payment on Houpt's note secured by the second mortgage, and gave his note for the balance, which—upwards of $3,000—fell due in December.

On the 22d of September, Dr. Turner was stricken with paralysis and was entirely unconscious for six weeks. After that he partially regained his consciousness and was able to answer a few questions about business affairs, but not to attend to any business of consequence, or to see any person on business, and in February, 1892, had a second stroke, and died on the 27th of April, 1892.

While lying in this condition his wife looked after his business as well as she could, and in December heard of the maturity of the renewal note which her husband had given to the holder

of the second mortgage, and was obliged to make another payment and renew it.

She also examined into the condition of the Maryland property, and for that purpose came into contact with Messrs. Barrows & Bliss. She then learned that in May, prior to the execution of the deeds, a judgment for upwards of $3,000 had been rendered against Mr. Houpt in the Maryland courts, which was a lien upon the premises, and she supposed that it was a lien in addition to the amount provided for in the contract and mentioned in Mr. Houpt's affidavit above referred to. In point of fact the judgment was not an additional lien upon the premises, but was rendered against Mr. Houpt as a garnishee debtor to the holders of the first mortgage, and it added nothing to the incumbrance on the premises, because a payment of it would be a payment on account of the first mortgage.

She found the affidavit of Mr. Houpt among Dr. Turner's papers some time in December, but did not find the original contract of conveyance with the written description of the property annexed to it until long afterwards, nor did she know of it.

She, in December, 1891, laid the case before Mr. McDermott, who had been the counsel of Dr. Turner, and he filed the bill in this cause, December 31st, 1891, which attacked the conveyances on the ground of the fraudulent representations as to the amount of the incumbrances, setting out the judgment of $3,000, alleging the insolvency of Houpt and wife, and praying that the conveyances might be set aside.

A *lis pendens* was filed under the bill.

Shortly after that, early in January, 1892, Mr. Houpt negotiated an exchange of the Norwood inn property with Mr. John P. Brinton, of Philadelphia, for a farm that gentleman owned in Virginia. In the examination of the title which Mr. Brinton caused to be made he encountered the *lis pendens* filed by Mr. McDermott in the Monmouth county records. He immediately called on Dr. Turner; he was not able to see him, but saw Mrs. Turner, and she stated to him generally what the ground of complaint was, and referred him to Messrs. Barrows & Bliss. He went to them and learned nothing further, and went again

to Mrs. Turner and was by her referred to her counsel. But the result of the interviews, and a view of a copy of the bill, was that he understood that the only ground of complaint was the judgment above referred to. He then completed his contract with Mr. Houpt in this wise: he accepted the title to the Norwood inn property, which was conveyed to him by Houpt and wife by deed dated the 18th of February, and he put Mr. Houpt in possession of the Virginia farm at the same time, and executed to him a conveyance of it, which he lodged undelivered in escrow with a title company in Philadelphia.

On the 16th of March, 1892, the defendants, Houpt and wife, answered the original bill, in which they showed that the judgment against Mr. Houpt in the Maryland court was of the character hereinbefore stated.

In the meantime Mrs. Turner, upon further search among the papers of her husband, found the original agreement of May 21st, 1891, whereupon she immediately communicated with Messrs. Barrows & Bliss and with her counsel, Mr. McDermott, and he filed the amended bill in this cause on the 9th of March, 1892, in which he set up the judgment mentioned in the original bill, and also the misrepresentations hereinbefore mentioned in full, did not notice the conveyance to Mr. Brinton, nor make him a party, and on the 6th of April, 1892, obtained an order upon the defendants to answer within thirty days after service of a copy of the order upon them.

They did not answer.

On March 26th a deed was tendered to Houpt.

On April 27th Dr. Turner died testate of a will made in 1889, by which he gave all his property to his wife, Lillian M. Turner, and appointed her executrix. That will was duly proven in the city of Philadelphia.

On the 22d of July Mrs. Turner filed her bill of revivor against Houpt and wife, which resulted in an answer by them to the amended bill and bill of revivor on the 23d of August, 1892. That answer set up that the Maryland property had been sold under foreclosure, and the title passed out of complainants, so that they could not rescind by a reconveyance.

The facts of that foreclosure are that on the 6th of June, 1892, Mrs. Taylor, who was the mortgagee of the first mortgage on the Maryland property, assigned the same to a Mr. Milliken, who lived in Maryland, and that he advertised the same for sale on the 5th of July, by virtue of a power contained in the mortgage; and at that time he put it up for sale, first in parcels, and it was so bid off, the whole aggregating $10,925. He then put it up as a whole, and it was sold to Mrs. Taylor, the mortgagee, for $12,055. An order to show cause why this sale should not be confirmed was made by the district court sitting as a court of equity, and duly published, and the sale was confirmed on the 28th of December, 1892.

Neither Mr. nor Mrs. Turner, nor Mr. and Mrs. Houpt were made parties to that proceeding, or had any other notice of it except that of publication in the newspaper, the only parties mentioned being the mortgagors, Mr. and Mrs. Adams, and the mortgagees, Mr. and Mrs. Taylor. The defendants, however, did have actual notice and knowledge of the sale (as shown by their answer filed August 23d, 1893) before it had been confirmed by the court.

Let us now inquire as to the merits of the case between the parties hereto. And, first, my conclusion from the evidence is that the descriptive statements, written and oral, made by Houpt to Dr. Turner as to the acreage, condition and value of this property were essentially and materially untrue.

Dr. Turner lost not only the whole property conveyed to Houpt, but the amount which he paid and became liable to pay on the second mortgage. The doctor's property at Avon was fairly worth $12,000 to $15,000 over the incumbrance of $9,000.

I further conclude that the representations were fraudulently made; that is to say, that they were made for the purpose of misleading Dr. Turner so far as it was practicable under the circumstances to mislead him. I can conceive of no other purpose or motive for which they could have been made, and such object and purpose rendered them fraudulent.

It seems too clear for argument that if the exchange had been made on the strength of these statements without any inspection

of the premises, it would not stand in equity, but would be set aside.

This brings us to the serious question in this cause, viz., how is the case varied by the fact that not only was the contract made subject to inspection and subsequent approval, but that such inspection did actually take place, and after it was made an approval in writing was signed?

In considering this question it is to be observed that the untrue representations in this case cannot be classed as mere commendations, or as the ordinary praise which the seller bestows upon his wares; nor, again, were they mere expressions of opinion or judgment, or of hope or expectation. On the contrary, they were precise statements of alleged facts within the actual knowledge of the defendant.

Now I think that certain principles governing transactions of this kind are clearly deducible from the numerous judicial utterances and decisions on the subject. No man is justified, either in morals or in law, in knowingly making a false descriptive statement about the subject-matter of a proposed contract which may influence the mind of the other party in the transaction. No party has any right, either in law or in morals, to rely upon either the ability or the opportunity of the other party to discover the falsehood of his representations and thus avoid injury from it. And in actual practice no party does make such false statements in the expectation that they will certainly be discovered and will have no influence. For, with such certain discovery in prospect, why make them? In short, nobody has the right to set a trap for his neighbor even in a place where it is so exposed to view as to render it highly improbable he shall step into it; and if, peradventure, he does step into it, the trap-setter has no right to say to him, you ought not to have been so careless and negligent as to step into a trap exposed to full view. The willful wrongdoer is not entitled to the benefit of the defence of contributory negligence.

Hence the practical rule seems thoroughly established that where false representations of the character here in question have been made previous to a sale, the presumption is that they

did influence the mind of the other party and helped to produce the sale, and the burden is on the fraud-doer to prove clearly that they did not influence the sale.

Says Mr. Kerr, in his book on *Fraud and Mistake* (*Am. ed.*) *p. 75:* .

"If any one of several statements, all in their nature more or less capable of leading the party to whom they are addressed to adopt a particular line of conduct, be untrue, the whole transaction is considered as having been fraudulently obtained, for it is impossible to say that the untrue statement may not have been precisely that which turned the scale in the mind of the party to whom it was addressed. A man who has made a false representation in respect of a material matter must, in order to be able to rely on the defence that the transaction was not entered into on the faith of the representation, be able to prove to demonstration that it was not relied on. It is not enough for him to say that there were other representations by which the transaction may have been induced; nor can he be heard to say what the other party would have done, had no misrepresentation been made."

And again (on *p. 79*):

"A man who, by misrepresentation or concealment, has misled another, cannot be heard to say that he might have known the truth by proper inquiry; but must, in order to be able to rely on the defence that he knew the representation to be untrue, be able to establish the fact upon incontestable evidence, and beyond the possibility of a doubt."

And again (at *p. 81*):

"No man can complain that another has relied too implicitly on the truth of what he himself stated. If a vendor has stated in his proposals the value of the property, he cannot, except under special circumstances, complain that a purchaser has taken the value of the property to be such as he represented it to be."

Lord Cranworth, in *Reynell* v. *Sprye, 1 De G., M. & G. 660* (at *p. 710*), says: "In such a case it is no answer to the charge of imputed fraud to say, that the party alleged to be guilty of it recommended the other to take advice, or even put into his hands the means of discovering the truth. However negligent the party may have been to whom the incorrect statement has been made, yet that is a matter affording no ground of defence to the other. No man can complain that another has too implicitly relied on the truth of what he has himself stated."

Turner *v.* Houpt.

Lord-Justice Knight Bruce, in *Price* v. *Macauley, 2 De G., M. & G. 339* (at *p. 346*), says: "Supposing, however, that the defendant had actually known, at the time of the purchase, what were the real state and condition of the subject-matter of the contract, it may be that he would not be entitled to complain. But in order to enable a vendor to avail himself of that defence in such a case, he must show very clearly that the purchaser knew that to be untrue which was represented to him as true; *for no man can be heard to say that he is to be assumed not to have spoken the truth.* * * * It is said that subsequently he had such notice as might have led him to ascertain how the facts stood. That, however, is not sufficient in a case of misrepresentation; he must be shown clearly to have had information of the real state of the facts communicated to his mind."

Lord-Justice Turner, in *Kisch* v. *Railway, 3 De G., J. & S. 122* (at *p. 134*), says: "When persons undertake to make statements as to the contents of documents, they cannot, in my opinion, be heard to say that the statements which they have made were known to be untrue, unless indeed they can show by incontestable evidence that this was the case, and that the business in hand proceeded on that footing. It is not, in my opinion, competent to them to say to the persons to whom the statements have been made, 'You had notice of the documents and might have seen them, and ascertained whether the statements were true or not.'"

Sir George Jessel, in the later case of *Redgrave* v. *Hurd, L. R. 20 Ch. Div. 1 (1881)* (at *pp. 13, 14*), says: "If a man is induced to enter into a contract by false representation it is not a sufficient answer to him to say, 'If you had used due diligence you would have found out that the statement was untrue. You had the means afforded you of discovering its falsity, and did not choose to avail yourself of them.' I take it to be a settled doctrine of equity, *not only as regards specific performance but also as regards rescission,* that this is not an answer unless there is such delay as constitutes a defence under the statute of limitation. * * * Nothing can be plainer, I take it, on the authorities in equity, than that the effect of false representation

is not got rid of on the ground that the person to whom it was
made has been guilty of negligence.   *   *   *   It is not suffi-
cient, therefore, to say that the purchaser had the opportunity
of investigating the real state of the case, but did not avail
himself of that opportunity."

Further on in his judgment he proceeds to make a critical
examination of the judgments of the house of lords in the great
case of *Attwood* v. *Small, Younge 407; 6 Cl. & Fin. 232,* and con-
cludes (at *p. 17*) as follows: "In no way, as. it appears to me,
does the decision, or any of the grounds of decision, in *Attwood* v.
*Small,* support the proposition that it is a good defence to an
action for rescission of a contract on the ground of fraud that
the man who comes to set aside the contract inquired to a certain
extent, but did it carelessly and inefficiently, and would, if he
had used reasonable diligence, have discovered the fraud."

Lord-Justice Baggallay, in the same case, says (at *p. 22*):
"The mere fact that a party has the opportunity of investi-
gating and ascertaining whether a representation is true or false
is not sufficient to deprive him of his right to rely on a misrepre-
sentation as a defence to an action for specific performance.   The
person who has made the misrepresentation cannot be heard to say
to the party to whom he has made that representation, 'You
chose to believe me when you might have doubted me, and gone
further.'   The representation once made relieves the party from
an investigation, even if the opportunity is afforded."   And adds
(at *p. 23*): "It is true that in the present case there was some
investigation, but it was an investigation of a most cursory char-
acter, which could not have enabled the defendant to ascertain
the truth or the falsity of the representation that had been
made."

Professor Pomeroy, in a note to section 895 in the second edi-
tion of his treatise on *Equity Jurisprudence p. 1261,* after citing
from the opinion in *Redgrave* v. *Hurd,* says:

"The question is, did the party rely on the representation, or on his own
knowledge? To obviate the effect of the representation, it must be clearly and
conclusively shown that he relied *on his own* knowledge. This the general
doctrine and the qualification both demand."

Turner v. Houpt.

There may be and undoubtedly are decisions and *dicta* which seem in some degree to conflict with these views, but an examination of them shows, as I think, that most of them vary from the case in hand in some particular, as, for example, that the representation was ignorantly and innocently made, without intention to defraud, or was in its nature mere commendation or the expression of opinion, or hope, or expectation.

I think the true rule to be deduced from the cases is that where a positively false and fraudulent descriptive statement has been made by the vendor, and an examination of the premises has been made by the purchaser before the contract was entered into, such examination by the purchaser can only avail the vendor as evidence more or less cogent, according to the circumstances, that the purchaser did not, in fact, rely in any material degree upon such false representation, but is not conclusive on that point.

Let us now inquire—*first,* as to the mental capacity of Dr. Turner to make an examination and appreciate its results ; and, *second,* as to the opportunity for and thoroughness of the examination which he did make.

I have said that he was spending the previous winter with his wife in Florida, and that he went North about the 1st of March. He was attacked with the grippe in New York city, and as soon as he was physically able he went to the house of his sister, Mrs. Schuyler, at Waterbury, Connecticut, and stayed there for ten or twelve days, until he was sufficiently convalescent to return, by slow stages, to Florida. This attack of the grippe seriously affected his mind. Mrs. Schuyler swears that " his mind was very weak," and he was " far from being what he had previously been," and that his mind was " weak and somewhat unbalanced ;" that he was childish, " and asked the same things over, asking for a story like a child."

"*Q.* What?

"*A.* A story ; asking stories of my husband in regard to the war ; the same thing over and over, day after day, and evening after evening, till my husband got very tired of it.

"*Q.* The same story, do you mean ?

Turner *v.* Houpt.

"*A.* The same story; wanted to know the same story about this certain battle.

"*Q.* Can you recall other circumstances?

"*A.* Why, there were a number of little things, of course, that I saw that made me think that he was not quite right, but I don't know that I can think of any one particular thing just now."

This witness proves that his father and grandfather and great-grandmother had been insane. She also swears that the doctor had previously had attacks of melancholy of short duration.

He returned to Florida about April 1st. His wife at once noticed a decided change in his mind. He was suffering from mental depression and forgetfulness. Mrs. Turner swears:

"*A.* The first thing that I noticed about him was his depression; it was just the opposite of his natural disposition, and was so marked that we all noticed it; his mother was with me at the time, and all those of his friends there, and we did everything to try and get him out of that condition.

"*Q.* State such further matters as you observed.

"*A.* Then the forgetfulness I noticed.

"*Q.* Was there any difference in that particular from his previous condition?

"*A.* Yes, sir; I never had noticed it in him before; then in his not being able to talk clearly; he could not express himself clearly; he would hesitate, stop, and say, ' Well, I have forgotten what I was going to say;' then, too, the fact that has been referred to before, his wanting to play cards continuously; sometimes nearly all day—morning, noon, or night he would come in and want to play cards; I objected at first, but I found that the objection only irritated him, so I yielded, and we played whenever he wished to.

"*Q.* How long did you keep up this card-playing?

"*A.* All the time we were down South; almost continuously.

"*Q.* Did you notice anything as to his record of the games?

"*A.* He kept the record of every game that was played.

"*Q.* For how long?

"*A.* During the time that we played.

"*Q.* By the Court—What were you playing?

"*A.* We were playing euchre.

"*Q.* By Mr. McDermott—Can you tell us the extent that that card-playing was kept up?

"*A.* The last counting I remember was up in the fourteen hundreds.

"*Q.* And had the doctor been addicted to this game before this attack of the grippe?

"*A.* No, sir."

His sister, Mrs. Schuyler, says that during all this period he wrote her daily, and sometimes several times in one day, letters

Turner v. Houpt.

and postals giving the records, and nothing more, of these games of which his wife swears.

Dr. and Mrs. Turner returned North the last of April. Of his condition after his return North Mrs. Turner testifies thus:

"*Q.* What did you observe in May, June and July?

"*A.* I noticed a gradual failing and a growing tendency whenever he was crossed in anything to an excitability that he never had before.

"*Q.* What else did you notice?

"*A.* I don't know that there was anything else.

"*Q.* How was his judgment on any little matters that arose—the ordinary routine matters of life?

"*A.* I don't think that it was as good as formerly; but the moment that I approached him on *that* he became so excited that I was obliged to stop.

"*Q.* So far as you could observe, was there any improvement during the summer in his condition mentally—in his mental condition during the summer?

"*A.* No, sir; nor physical either.

"*Q.* By the Court—What change was there, if anything?

"*A.* It was that he gradually grew worse."

Dr. Gulick, a practicing physician of New York city, who had paid some little extra attention to mental diseases, had been Dr. Turner's family physician for two years in New York city. He saw him on his return from Florida about May 1st, 1891, about six weeks after his attack of the grippe in March, and saw him again at Avon about June 1st, and again at various times during the summer. He was asked this question:

"What was his condition when he first came back from the South the last of April or the 1st of May?

"*A.* I noticed a very decided change, and I asked him what had been the matter, and he said the grippe; he was troubled with congestion of the brain; there are two kinds—active and passive; his mind didn't seem clear to me; and after seeing him at Avon—I hadn't seen him then for perhaps a month—and I noticed a decided change at that time, so much so that I mentioned it to my mother.

"*Q.* During the time you saw him the last of April or the 1st of May, and when you saw him at Avon, you saw a decided change?

"*A.* Yes, sir; I saw him at Avon in July, I think it was, and the date I can't tell.

"*Q.* Did you notice anything which indicated the progress of the disease between these two different times that you have mentioned—in the spring and in the summer of 1891?

Turner v. Houpt.

"A. I did, sir; the last time was the time just before I left the shore to come home; he came to my house.

"Q. By the Court—What time was that?

"A. That was the last of August; and I then had a long talk with him concerning his condition and concerning his business, and went so far as to say to him that I thought he was making a mistake to branch out into business.

"Q. What did you find the condition of his mind to be?

"A. Greatly excited; his business transactions led me to believe that he was doing more than he ought to, and I said to him, 'a man at your time of life ought to draw his lines together rather than put them out;' at that time I observed that he complained a great deal of his head and I told him that he ought to live differently—that he should not smoke at all; he had smoked some, but that would not explain his condition, because he had always smoked, and I told him I thought he should not smoke; he was also suffering with gravel in the bladder, which was very materially aggravated at that time and for which I prescribed numerous times, and that was materially aggravated at that time; and in about a month or six weeks I was telegraphed to come to Philadelphia to see him, when he had this stroke of paralysis.

"Q. Have you any theory, from your knowledge of the case, what caused the paralysis?

"A. I should say from the grippe; very clearly laid down by Professor——

"Q. I don't care for your authorities.

"A. I will give you my own learning.

"Q. Was it your opinion that the effect of the grippe was working on him, so to speak?

"A. Yes, sir; had assumed a chronic form; he never was free from it.

"Q. How far, in your judgment, if at all, was his mental balance disturbed, his judgment and his capacity to do business, between the time he had the grippe and the time he had paralysis?

"A. It seemed to be impaired more each time I saw him; just how much it is difficult to measure.

"Q. By Mr. McDermott—Dr. Turner died from this stroke of paralysis, did he not?

"A. Yes, sir; from hemorrhage of the brain."

Louis L. Davis, who kept the hotel at Avon, where Dr. Turner spent the summer of 1891, and who had known him previously, swore as follows:

"Q. Did you notice any change in the condition of the doctor, bodily and mentally, from his condition when he went there?

"A. I noticed considerable change from the season of 1890.

"Q. What was the character of the change?

"A. I noticed he was very derelict in his mind, in his memory, and he wandered around helplessly, and didn't seem to be his natural self; he was

Turner *v.* Houpt.

always of a jocular disposition before, and at that time he didn't seem to be his natural self as I had formerly known him.

"*Q.* Did you notice anything else that you can recollect? Give any instances.

"*A.* I can't recall any particular date; I can recall some instances where he would relate a joke, and a few hours later relate the same joke afterwards; and he had a mania for going into the law business or something of that kind that there was no necessity for going into.

"*Q.* Mania; you mean stirring up lawsuits?

"*A.* Not stirring them, but trading, and doing that also; he always wanted to be trading property.

　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

"*Q.* By the Court—What did you mean by saying that he was trying to get up a trade?

"*A.* Well, he was always looking out for a bargain in property and anxious to make a trade if he found out or thought that he could make anything by it, like everybody else in business; but he appeared to have a mania in that way."

These witnesses were examined in my presence, and their manner on the stand was such as to give me confidence in the reliability of their evidence.

Opposed to this is the evidence of several witnesses who saw and conversed with Dr. Turner during the period in question, and who observed nothing unusual about him. On the contrary, they thought he was unusually bright and smart in a trade. The evidence shows that he was continually seeking an opportunity to deal in real estate, and that he spoke in a boasting strain of his ability in that direction.

The effect of this evidence on my mind is that I am convinced that Dr. Turner, during the whole period in question, was suffering from disease of the brain in the form of congestion of that organ, and that it affected his mind and reduced his mental capacity and especially his judgment; that it was progressive in its character, so that the mental disability increased in degree continually, until it culminated in paralysis in September. One of the manifestations of this disorder was a disposition to make deals in real estate. I think Mr. Davis' description is quite accurate when he says that he had a "mania" in that direction.

This brings me to the question of the degree of this mental disability. Now, it is a mere truism to say that a man may have sufficient mental capacity to attend to the ordinary affairs

of life, such as collecting his interest and rents, and paying his house bills, making ordinary purchases for his current wants and those of his family, or renting a house to live in, or engaging lodgings, or traveling from place to place and transacting a multitude of ordinary routine business matters which require a small degree of mental capacity, who would be entirely unfit to take care of himself in a transaction requiring *discernment* and *judgment*. By "judgment" I mean the capacity to examine two subjects, and to understand and appreciate their several characteristics and to compare them. A farmer may by nature or through mental disease be so far demented as to be quite unable to act with intelligence and judgment in the matter of an exchange of his farm, who is able to carry it on to a fair advantage, raise good crops and make a fair sale of them in the markets. It is not an uncommon thing to see a man who is, notoriously, somewhat disturbed in his mind—partially insane—who goes about attending to the ordinary routine of his every-day life and affairs, and who is equally and notoriously unfit to enter upon and carry through any extraordinary affair requiring reflection, discrimination and judgment. I have two such in my mind at this moment.

In this connection it is proper to remark that the standard of testamentary capacity—which I venture to suggest is, in this state, sufficiently low—is not the standard of business capacity, and that wills have been, and will hereafter be, sustained, made by persons whose minds are so enfeebled that the courts would unhesitatingly set aside business contracts entered into by them to their loss. In fact, it is familiar law that a higher degree of intellect is necessary to sustain a contract than a will. *Sloan* v. *Maxwell, 2 Gr. Ch. 563*, and the quotations there made from previous opinions (found at *pp. 568, 570*). The learned judges there quote with approval the language of Judge Washington in *Harrison* v. *Rowan, 3 Wash. C. C. 580* (at *p. 586*), where he says: "His capacity may be perfect to dispose of his property by will, and yet very inadequate to the management of other business, as, for instance, to make contracts for the purchase or sale of property." And, again, from the opinion of the same learned

judge in *Den* v. *Van Cleve, 4 Wash. C. C. 262* (at *p. 266*), where he says : " But his memory may be very imperfect ; it may be greatly impaired by age or disease ; he may not be able at all times to recollect the names, the persons or the families of those with whom he has been intimately acquainted ; may at times ask idle questions, and repeat those which had before been asked and answered, and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect to make and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will."

The same distinction was made in *Converse* v. *Converse, 21 Vt. 168; S. C., Ewell L. Cas. 652.*

Upon this part of the case I desire to refer to, without repeating, what I had occasion to say in *Kastell* v. *Hillman, 30 Atl. Rep. 535* (at *p. 540*) ; *8 Dick. Ch. Rep. 49* (at *p. 63*), a case in some respects like the present. I there adopted Chief-Justice Kirkpatrick's test of testamentary capacity as being the ability " clearly to discern and discreetly to judge."

But the question here is not whether Dr. Turner had mental capacity sufficient to " clearly to discern and discreetly to judge " of his affairs so as to make a valid will, but whether he had such capacity as would enable him to properly examine the property in question and fully discover the falsity of the statements made by Mr. Houpt, both as to its quality and as to its value.

Let us answer this question with a consideration of what he actually did in the way of investigation. He visited the mill and farm, May 25th, 1891, in company with Mr. Houpt and Mr. Barrows, and spent from one hour to one hour and a half upon the premises. Dr. Turner went into the mill and talked with the loom-boss, who had been in charge when it was in operation. He crossed the farm in company with Mr. Houpt, who showed him what he claimed to be the iron ore bed and also the marl. He looked at the dwellings and buildings. Mr. Barrows took no part in the examination, if it may be properly so termed, and made no suggestions; was a mere passive observer.

No expert was employed to examine the mill and machinery,

35

or the so-called ore bed or marl pit. The peach trees were not counted or examined ; no means were taken to ascertain the acreage. In short, the examination, like that in *Redgrave* v. *Hurd*, *supra*, was of the most hasty and cursory character.

Now, Dr. Turner had had no experience in either woolen manufacture, iron ore, marl, peach-growing, or farming generally ; and if he had enjoyed his faculties in their perfection would have been quite incapable of estimating the qualities and value of this property ; and it does seem to me that he would have been conscious of his incapacity in that respect and would not have entered into this contract without seeking the aid of competent experts in the affair. In short, the very fact that he did not seek such aid is a strong indication to my mind of the low degree of his mental capacity, and indicates strongly that he was carried away by a mania for trading, the result of a diseased brain and a morbid judgment.

The result of the evidence is that Dr. Turner did not make such an examination of the property as to overcome the burden cast upon Houpt to show and prove clearly that he relied altogether on his own knowledge of the property and not on the statements and representations of Houpt.

This is especially true as to value. Houpt's representation was that it was worth $40,000. Now, Dr. Turner estimated his property—the "Norwood"—at $30,000, subject to $9,000 incumbrance. It was well worth from $20,000 to $25,000, or $12,000 or $15,000 over the mortgage. The Maryland property was mortgaged for nearly $17,000—$8,000 more than the Norwood. To make it worth as much for purchase or exchange it should have reached the full value of $30,000. At the represented value of $40,000 it would have had an equity of $23,000, as against an equity of $21,000 in the Jersey property at an estimated value of $30,000.

Now it is plain that Dr. Turner must have relied more or less upon this representation of value, and was misled by it, as well as the other false representations. His capacity for discernment and judgment was practically destroyed.

It is said that he was assisted by Mr. Barrows. But it does

Turner v. Houpt.

not appear that that .gentleman rendered the least assistance, or had the disposition or capacity to do so. He certainly had no interest to do or say anything to discourage the exchange. His commissions depended upon its going through, and he actually received $750 as compensation for standing quietly by and seeing his client traded out of $12,000 or $15,000. I am not surprised that the counsel of complainant, acting upon the instruction and information of the helpless wife, charged in his bill that Mr. Barrows had conspired with Houpt to defraud the husband.

If, then, Dr. Turner had promptly, after the exchange, asked the aid of this court to be relieved from it, I think it clear enough he would have been entitled to it.

Let us now inquire as to the effect upon his rights of the delay which occurred and of his acts of ratification.

The general rule that persons having equitable rights shall come promptly to the court for their enforcement, applies with especial aptness and force to cases of this character.

A party holding a title which he has the right to rescind, or a contract for a title from which he has the right to recede, cannot be permitted to speculate upon the situation with a full knowledge of his rights, and wait until he can ascertain whether it is to his advantage to affirm or disaffirm; and even if his delay be not the result of a desire to speculate, but be the result of mere indecision, he will not be permitted to rescind or recede, if the circumstances are so changed that the other party cannot be restored to his former position. The party clothed with the right of rescission may also, during the delay, do acts which are distinct affirmations of the transaction; and the other party may have so far acted upon the acquiescence and affirmative conduct as to raise an estoppel against the other party and render it inequitable to permit him to recede. In these, as in all other cases of conflicting equities, it is the duty of the court to carefully consider and weigh the conflicting rights, and so to decide between them as to do the greatest justice.

Affirmation and acquiescence, in order to work a bar to relief, must, in the absence of the element of estoppel, be accompanied with an intelligent appreciation by the party of his rights. In

a case where he has been led into a contract by false and fraudulent representations as to both the character and value of the subject of the contract, he must be fully aware of the falsity of the representations, and also of his right to rescind, and his conduct must show that he determined to abide by the contract.

Here, again, the fraud-doer is at a disadvantage. He has no right to rely upon the intelligent action of the victim of his fraud to discover it and repudiate the contract. The same considerations which apply to the entering into the contract apply to acquiescence in it and affirmation of it. This principle was announced and applied in *Rawlins* v. *Wickham*, decided first by Vice-Chancellor Sir John Stuart, as reported in a note to the case on appeal, in *28 L. J. Ch. (1859) 188*, and was affirmed by the lord-justices of appeal. *S. C., 3 De G. & J. 304.* There the delay was four years, and was strongly urged as a defence, but was disallowed by all the judges.

Now the evidence of Mr. Barrows shows that Dr. Turner did ascertain the falsity of Houpt's representation as to the quantity of land and the number of peach trees, and some other matters not mentioned. Houpt had also represented to the doctor that the note to secure which the second mortgage had been given, could be renewed every three months by paying $200 upon principal, besides the discount. This note was held by a Wilmington bank and was indorsed by Todd, the second mortgagee, and was renewed by Houpt between the 21st and the 30th of May, so that it matured in the latter part of August. At its maturity Dr. Turner was obliged to give his own note in its place and to pay $500, instead of $200, in order to procure its renewal. Of this he complained to Mr. Barrows. It does not appear that he discovered the falsity of the statement about the iron ore or marl, or that the machinery in the mill was not the best; nor does it appear that he ever knew that the property was not worth the incumbrances. On the contrary, it appears that at his interview with Mr. Todd, the holder of the second mortgage, he spoke of the property as valuable and solicited Mr. Todd to join him in a scheme to market it. Now, the important matter with Dr. Turner was not so much whether the property was in all respects

just what Houpt represented it to be, but whether it was worth what he told him it was worth, or so near the amount as to save him from loss. On this score there is no evidence that he ever appreciated the real truth. And I do not believe that he was capable of so doing at the time he discovered the facts. No doubt Mrs. Turner did, when she came to look into the affair, and she acted as promptly and intelligently as a helpless woman could well do under the circumstances.

Now, it is to be observed that Dr. Turner did nothing to injure or to alter the property. He simply let out the farm on shares in the usual way. He made no other use of it. He kept the old loom-boss on the premises to take care of the premises generally, and machinery in particular by oiling it and setting it in motion from time to time. Here, again, the condition of his mind is an important factor. Dr. Gulick swears, as we have seen, that he was failing, both mentally and physically, and one of defendant's witnesses swears that on the occasion of a visit he made to the premises as late as August—after two other previous visits—he, on his arrival at the village of Millington, inquired the way to the farm, indicating that he could not remember the way after traveling it two or three times. I infer from Mr. Barrows' evidence that the doctor's complaints as to the falsity of Houpt's representations were made after his interview with Mr. Todd, which was on the 10th of September and only twelve days before the first paralytic seizure. I am satisfied that Dr. Turner's mental faculties were so far disturbed and his powers and judgment warped that he was unable to comprehend the actual value of the property which he had got, or to know and appreciate the extent to which he had been defrauded; and I see no reason to suppose that he ever knew previous to the intervention of his wife that he ever had any right of action against Mr. Houpt.

Upon the whole case I am unable to find that Dr. Turner deliberately and intelligently affirmed this contract after he had become aware of the true condition and value of the property and his rights in the premises.

Shortly after the amended bill was filed, and apparently as

soon as the doctor had sufficiently recovered from his second paralytic seizure, which occurred in February, to see a stranger, a deed of conveyance from him and his wife to Houpt for the Maryland premises was executed and duly acknowledged by them, and tendered to and left with Houpt. This was March 26th. Houpt subsequently returned it to the Philadelphia counsel of complainant. It thus appears that it was in the power of Houpt to have recovered the property in substantially the same plight it was in at the time of the exchange.

I am satisfied that complainant is entitled to relief as against Houpt and wife, and shall so advise.

This brings us to another branch of the case. After the case had been closed and submitted as against Houpt and wife, but before decision, complainant obtained leave to amend by making Mr. Brinton a party; and the bill was amended accordingly; he was brought in, answered, and was heard by witnesses and by counsel in argument.

No objection was made on his part to the procedure against him by amendment of the bill instead of by supplement; nor was any point made as to the time of the service upon Houpt and wife of the notice of the order of publication made against them as absent defendants, upon the return of the subpœna not served. The files of the court show that the subpœna to Houpt and wife was issued on the day the bill was filed, December 31st, 1891, returnable January 12th, 1892; that the order of publication was taken on the 15th of January, 1892, returnable March 17th, and that it provided for service personally upon Houpt and wife of a notice of the order within twenty days, and that such a notice was served upon both Houpt and wife on the 28th of January. Nor was any point made as to the contents of the *lis pendens* that was filed in the Monmouth county clerk's office immediately after the filing of the bill. It was conceded that it contained the statutory requisite of the names of the parties, a description of the premises and a statement of the object of the bill.

By the strictest rule respecting constructive notice of a pending suit this suit was commenced on the 28th of January, 1892, the

date of the service of the notice of the order of publication. The deed from Houpt to Brinton was dated and delivered February 18th, 1892. There was a preliminary agreement between Houpt and Brinton, but no payment was made under it or any consideration parted with until February 15th, 1892. But I understand that the strict rule that the effect of the suit as against purchasers commences with the service of a subpœna applies only to cases where the purchaser has no actual notice of the suit. Here Mr. Brinton did have actual notice, as he states by his answer and in his evidence, by an examination of the record of the *lis pendens* in Monmouth county, and of a copy of the bill.

He puts his case not on the ground that he did not have full notice of the suit and its object, nor that those objects have been in any wise changed by subsequent amendments, nor that the suit was not commenced at the time he took title, but on the single and sole ground that he made diligent inquiry as to the truth of the facts as displayed by the bill on February 18th, 1892, which facts were relied upon as constituting the fraud which was the basis of complainant's right, and satisfied himself that those facts did not constitute any fraud, and hence, that the complainant must fail in his suit; that he had no notice of the matters afterwards inserted in the bill by amendment, and is not chargeable in equity with notice thereof. In short, his position is that the bill is a *lis pendens* as against him as to those new matters only from the date of the amendment, and that he is a *bona fide* purchaser without notice of them.

As there is some appearance of authority for this position, it becomes necessary to examine it on principle, although the amount in controversy, as we shall see, is very small.

I stop here to say that I do not see that his position, as above stated, is helped by the inquiry which he made of the present complainant while her husband was disabled by paralysis. She was not the duly authorized agent of her husband, but acted in what she did as a volunteer, from necessity. She told Mr. Brinton all that she then knew. Her silence as to what she afterwards learned was innocent, and cannot bind her husband.

because he was mentally incapable of making any statement or representation; and Mr. Brinton was so informed. It is difficult to see how any estoppel can arise in favor of Mr. Brinton as against Dr. Turner. So far as the evidence shows, Messrs. Barrows & Bliss were mere brokers, and not confidential agents, of Dr. Turner, and whatever of agency there may have been was ended by his total incapacity.

Mr. Brinton can claim to be a *bona fide* purchaser only so far as he has actually parted with value on the strength of the apparent title in Houpt and wife. The case shows that the deed of conveyance from Brinton to Houpt was delivered in escrow, the terms of which are witnessed by a writing as follows:

"The accompanying deed from Joseph P. Brinton and wife to Henry J. Houpt, dated February 19th, 1892, for 300 acres of land near Leesburg, Va., is deposited with the Land Title and Trust Company to be held in escrow until all incumbrances, except a certain mortgage of $9,000 recited in the deed hereinafter mentioned, are removed from the title to lots Nos. 110, 111, 112, 113, 114, 116, 117, 396, 397, 398 and 400, in Key East, Monmouth Co., N. J., which have been conveyed to said Brinton by said Houpt and wife by deed dated February 18th, 1892, and intended to be forthwith recorded. In case by any possibility judgment should be recovered in the suit now pending against said Houpt and wife which may bind or affect the title to said lots and property in Key East, then the deed now deposited may upon request of said Brinton be delivered to said Houpt, who shall immediately execute to said Brinton a deed of trust on the said 300 acre farm near Leesburg in sufficient amount to secure and indemnify said Brinton against said judgment and all costs and charges on account of the same.

"In witness whereof we have hereunto set our hands and seals this twentieth day of February, A. D. 1892.

"J. P. BRINTON.   [L. S.]<br>
"HENRY J. HOUPT.   [L. S.]"

Certain personal property was delivered to Houpt with the possession of the premises, and, in addition, Mr. Brinton incurred the expense of building a certain fence and the commissions of the real estate agent who negotiated the exchange. There is, besides, the matter of the rents of the Virginia property. These small matters constitute all that Mr. Brinton has lost by the transaction. But these being insisted upon it becomes necessary to examine the position taken by him.

Turner *v.* Houpt.

In considering the question thus presented it must be borne in mind—*first*, that the new matters of fact set out in the amendment all existed prior to the filing of the original bill; *second*, that the subject-matter and ground of the suit, viz., fraud, and the prayer and the frame of the bill, have not been altered in substance; *third*, no new parties have been added who were necessary or proper at the time the bill was filed. The bill of revivor was promptly filed, and made no break in the *lis pendens*.

The ground of the bill is that complainant was led by false and fraudulent representations, constituting fraud, to make the exchange. The effect of the amendment is simply to add another specification of fraud which existed and might have been inserted in the bill at first, and upon which relief was finally had. Its omission was due to the mental incapacity of the complainant.

The question as to the effect of this amendment depends, as it seems to me, upon the question whether the doctrine, or rather maxim, "*pendente lite nihil innovetur*," is based upon the notion that the commencement of a suit affecting lands, whether in a court of law or in equity, is implied notice to all the world of the facts which constitute the grounds of the suitor's claim, so as to affect the conscience of would-be purchasers, or is only notice that such a suit is pending, and that all persons dealing with the defendant as to the land involved must do so at their peril as to the result of the suit. If the latter is the true ground of the maxim, then I do not see upon what ground a mere amendment of the character of that now in hand can affect its application.

The doctrine is thus stated by Mr. Justice Depue, in speaking of *lis pendens*, in *Haughwout* v. *Murphy, 7 C. E. Gr. 531* (at *p. 544*): "It is a doctrine of courts of equity [with great deference I suggest that he should have added "and of courts of law," since the doctrine applies with equal rigor to both] of ancient origin, and rests not upon the principles of the court with regard to notice, but on the ground that it is necessary to the administration of justice that the decision of the court in a suit should be binding not only on the litigant parties, but also upon those who

acquire title from them during the pendency of the suit." The
cases which he cites more than sustain his position.

To the same effect is Mr. Wade in his book on *Notice* §§ *337
et seq.;* and the learned writer of the article on *Lis Pendens,* in
*15 Am. & Eng. Encycl. L. 869.*

Lord Cranworth, in *Bellamy* v. *Sabine, 1 De G. & J. 566* (at
*p. 578*), says : " It is scarcely correct to speak of *lis pendens* as
affecting a purchaser through the doctrine of notice, though ·
undoubtedly the language of the courts often so describe its
operation. It affects him not because it amounts to notice, but
because the law does not allow litigant parties to give to others
pending the litigation rights to the property in dispute, so as to
prejudice the opposite party. Where a litigation is pending
between a plaintiff and a defendant, as to the right to a particu-
lar estate, the necessities of mankind require that the decision of
the court in the suit shall be binding, not only on the litigant
parties, but also on those who derive title under them by aliena-
tions made pending the suit, whether such alienees had or had
not notice of the pending proceedings. If this were not so,
there could be no certainty that the litigation would ever come
to an end." And again (on *p. 580*) : "The language of the
court in these cases, as well as in *Worsley* v. *Earl of Scarborough,
3 Atk. 392,* certainly is to the effect that *lis pendens* is implied
notice to all the world. I confess, I think that is not a per-
fectly correct mode of stating the doctrine. What ought to be
said is that, *pendente lite,* neither party to the litigation can
alienate the property in dispute so as to affect his opponent.
The doctrine is not peculiar to courts of equity. In the old real
actions the judgment bound the lands, notwithstanding any
alienation by the defendant *pendente lite,* and certainly that did
not depend upon any principle arising from implied notice."
To the same effect is the language of Lord-Justice Turner (at *p.
584*) : " The doctrine of *lis pendens* is not, as I conceive, founded
upon any of the peculiar tenets of a court of equity as to implied
or constructive notice. It is, as I think, a doctrine common to
the courts, both of law and of equity, and rests, as I apprehend,
upon this foundation—that it would plainly be impossible that

any action or suit could be brought to a successful termination if alienations *pendente lite* were permitted to prevail. The plaintiff would be liable in every case to be defeated by the defendant's alienating before the judgment or decree, and would be driven to commence his proceedings *de novo*, subject again to be defeated by the same course of proceeding." And he cites Lord Coke to show that the doctrine obtains at law as well as in equity.

Chancellor Kent, in *Murray* v. *Ballou, 1 Johns. Ch. 566*, and *Murray* v. *Lylburn, 2 Johns. Ch. 441*, examined all the authorities to that date, and puts the foundation of the maxim on necessity, whether it be applied at law or in equity. He does, indeed, in order to meet the manifest hardship of the rule in many cases (before statutory provision was made for recording notice of the *lis pendens*), resort to the doctrine of constructive notice, viz., that all citizens are chargeable with notice of what is going on in the courts.

Professor Pomeroy (*2 Pom. Eq. Jur.* §§ *632 a, 633*) adopts the view of the English judges in *Bellamy* v. *Sabine*, repudiates the notion of constructive notice and states the rule thus : " During the pendency of an equitable suit, neither party to the litigation can alienate the property in dispute so as to affect the rights of his opponent." And he cites (§ *633*) a long list of American authorities in its support, among which I cite particularly *Devey's Appeal, 97 Pa. St. 153*.

Mr. Maddock (*2 Mad. Ch. 189*) says :

" It is certainly a maxim, '*pendente lite nihil innovetur*' (*Co. Litt. 344 b*) ; but the true interpretation of that rule is that a conveyance does not vary the rights of the parties in a suit ; for (otherwise) suits would be interminable" &c.

The language of a judge of the Virginia court of appeals, in *Newman* v. *Chapman, 2 Rand. 93 (1823)*, is to the same effect. After stating that the rule was founded in necessity, he says : " The rule, as to the effect of a *lis pendens*, is one of mere policy, confined in its operations strictly to the purpose for which it was adopted ; that is, to give effect to the judgments and decrees of courts of justice, and that it is not *properly* a notice to any parties

Turner v. Houpt.

whatsoever. The English judges and elementary writers have carelessly called it a notice because, in one single case, that of a suit prosecuted to decree or judgment, it had the same effect upon the interests of the purchaser as a notice had, though for a different reason. But the courts have not, in any case, given it the real force and effect of a notice." And he points out that if the suit operated as a notice of the facts which formed the basis of plaintiff's claim, it ought to operate against a purchaser who buys after one suit is brought and discontinued and before another is brought and pursued to a successful issue, while the fact is that it does not so operate. Thus, in the case in hand, if the bill as first filed had contained all that is found in the amended bill, and afterward Mr. Brinton had purchased without inquiring into the merits of the complainant's demand, and then the bill had been dismissed by consent, without prejudice, and a new bill had been filed and successfully prosecuted, all the authorities agree that, in the absence of actual knowledge by Mr. Brinton of the facts upon which complainant's equity rests, he would not be affected by the second suit. This result must, of course, be based upon the ground that the suit, even with the aid of the statutory notice, operates only as a notice that a suit is pending affecting the property, and not of the facts out of which the complainant's right arose.

The manifest hardship of applying this necessary maxim in cases of conveyances in good faith to parties without notice led to a statutory provision for a public registry of a notice, and the terms of this statute are significant. It simply requires (*Rev. p. 114 § 57*) the filing and registry of a notice containing the title of the cause, that is, the names of the parties complainant and defendant, a description of the land to be affected and the " general object " of the suit. Nothing more. It does not provide for any notice of the facts out of which complainant's right arose, or even of the equitable ground—fraud, accident, mistake or the like—upon which it rests. All that the legislature deemed necessary that an expectant purchaser should know is that a suit is pending against a *certain party*, *affecting certain lands* in a *certain way*.

Turner v. Houpt.

These considerations seem to lead to the conclusion that the question of the continued pendency of the suit is one of actual and substantial identity. Are the parties the same, the property to be affected the same, and the general purpose and object of the suit the same? If so, then I am unable to understand upon what ground the making of amendments not affecting either of these characteristics can interfere with the application of the maxim in question. For example, if a plaintiff in ejectment should, upon demand, furnish particulars of his title, containing a statement of a deed of conveyance from A to B, and should afterwards discover that this was a mistake and that there was no such deed, but that the title had passed from A to B by means of a judgment against A and a sale by sheriff thereunder to B, and should amend his specifications of title accordingly, would such amendment destroy the continuity of his *lis pendens* and make a new suit, so that a purchaser from the defendant, after the commencement of the suit and before the amendment, who had not notice of the sheriff's deed, would get a good title? I think there can be but one answer to that question. It would not, and for the simple reason that the question was whether the title did, in fact, pass from A to B, and not how it passed.

Now, what has been done in the case in hand seems to me to be of the same character as that of the case just supposed. Here the ground of relief stated in the bill as originally filed was fraud practiced in procuring the exchange. The supposed misrepresentation as to the incumbrance was but a mere specification of that fraud; afterwards other fraudulent misrepresentations of the same character are discovered, and inserted by way of amendment. How can it be said that their insertion changes the identity of the suit as to its parties, subject-matter or purpose? If not, then why does not the maxim *"pendente lite nihil innovetur"* apply?

Two adjudged cases in this country support this view. *Stoddard* v. *Myers, 8 Ohio 203 (1837)*, and *Gibbon* v. *Dougherty, 10 Ohio St. 365 (1859)*. The first was an ejectment in which plaintiff relied upon a purchase at a judicial sale in an equity suit of *Beitz* v. *Wolf,* which was founded upon a common-law

judgment recovered by Beitz against Wolf, and which attacked
a voluntary conveyance made by Wolf to his children prior to
the recovery of the judgment.   Pending this equity suit Wolf
succeeded in reversing the judgment on a writ of error, and then
his children conveyed for value to the defendant in ejectment.
Upon a new trial of the action at law of *Beitz* v. *Wolf*, Beitz
again recovered, and then filed a supplemental bill founded upon
his second judgment, and procured a decree setting aside the con-
veyance from Wolf to his children, a sale of the premises to pay
his judgment, and under that sale plaintiff in ejectment claimed.
On the argument of the ejectment the question of *lis pendens*
was elaborately discussed, and the court held " that by the insti-
tution of a suit the subject of litigation is placed beyond the
power of the parties to it; that whilst the suit continues in
court it holds the property to respond to the final judgment or
decree."

In the second case complainant had entered judgment prema-
turely upon a valid award of arbitrators, and then filed a bill
against the defendant and one of his debtors to appropriate the
debt to the payment of his judgment.   After bill filed, defend-
ant succeeded in vacating the judgment on the award as prema-
turely entered, and induced the debtor to pay him his debt.
Complainant again entered judgment on his award, but not until
after the payment by the debtor to the defendant, and filed a
supplemental bill setting up the second judgment.   The debtor
defended on the ground that the force of the *lis pendens* was
broken by the setting aside of the judgment; but the court held,
on the authority of *Stoddard* v. *Myers*, that the same suit was
pending, and the debtor was not justified in paying the defend-
ant, saying (at *p. 371*): " We think the construction thus early
given to this provision, as expressed in the act of 1831 (which
authorized a creditor's bill only after judgment recovered), sup-
ported by principles of law as well as sound reason.   The subject-
matter of the suit and the parties in the action, as well as the
object of the suit, all continued to be before the court.   The
substantial object was the payment of the debt of the judgment
debtor; and the reversal of that judgment for an irregularity

was in no sense an intimation of its payment, or a relinquishment of the claim of the plaintiff to enforce its payment in the manner and by means expressed in the petition."

I will now consider what I have mentioned as the appearance of authority the other way.

In *Long* v. *Burton, 2 Atk. 218*, after the answer to the original bill had been reported insufficient, the defendant filed a cross-bill. The plaintiff in the original suit obtained an order that the original bill should be answered before he answered the cross-bill, and on the answer being reported insufficient, he obtained an order to amend his bill, and that the defendants might answer the amendment and exceptions together. It was held that the order to amend was a waiver of the priority of right to an answer. In delivering judgment, Lord Hardwicke said : " By the course [practice] of the court the plaintiff, in the cross cause, cannot have an answer till he has himself answered the original bill ; but this is a privilege the plaintiff in the original bill has in right of his original bill ; for if after the cross-bill is filed he will amend the original bill in material parts, I do not think he is entitled to have an answer to the amendments ; for as the bill may be *amended both in discovery and relief,* the pendency of suit, as to those parts which are amended, is only from the time of the amendment."

And this *dictum* is the foundation of whatever of authority can be found for the notion that a simple amendment breaks the continuity of the suit and destroys the effect of the *lis pendens* as against third parties. The character of the amendment in that case is not given, except as it may be inferred from the words " amended both in discovery and relief." So that it is probable that the learned chancellor had in mind a complete change in the object and purpose of the bill. Certain it is that it by no means appears that he did have in mind the maxim " *pendente lite nihil innovetur*," for it was in no wise involved.

Upon the authority of this *dictum*, Lord Redesdale, speaking of amendments (*Mitf. Pl. *330*), says :

" When injury may arise to others the indulgence has been more rarely granted ; and so far as the pendency of a suit can effect either the parties to

it, or strangers, matter brought into a bill by amendment will not have rela-
tion to the time of 'filing the original bill, but the suit will so far be considered
as pendent only from the time of the amendment, except that where a bill
seeks a discovery from a defendant, and having obtained that discovery, the
bill is amended by stating the result, it should seem that the suit may, accord-
ing to circumstances, be considered as pendent from the filing of the original
bill, at least as to that defendant, and perhaps as to the other parties, if any,
and to strangers also, so far as the original *bill may have stated matter which
might include in general terms the subject of the amendment*" (citing only *Long* v.
*Burton, supra*).

This passage is appropriated by Mr. Daniell (*1 Dan. Ch. Pr.
402 bottom*), citing only *Long* v. *Burton* and Lord Redesdale's
treatise. The American editor cites two cases from Tennessee,
which I will notice directly. Mr. Justice Story (*Story Eq. Pl.
§ 904*) also adopts Lord Redesdale's language upon the same
authority.

An examination of the English authorities discloses but one
case since *Long* v. *Burton*, in which the question has been stated,
viz., *Morris* v. *Landon, 5 Sim. 247*. There the bill was filed in
January, 1816, claiming against the defendant an equitable estate
in certain houses. The defendant answered. In 1818, and again
in 1819, the defendant mortgaged the houses, and in the same
year sold and conveyed them in fee for value, subject to the
mortgages. Neither of the mortgagees or the grantee had any
actual notice of the suit; and at that time there was no provision
in the English statutes for a registry of a *lis pendens*. In 1820
the bill was amended and the amendment taken as confessed as
against the defendant, who had no further interest in the subject-
matter, and the suit went to a final decree in favor of complainant.
In 1831 complainant filed a bill against the purchaser *pendente
lite* to obtain the benefit of his decree, and moved for a receiver.
In arguing for the defendant, Mr. Pepys (afterwards Lord Cot-
tenham) took the point that the suit was pending as against a
purchaser only from the date of the amendment. Vice-Chan-
cellor Shadwell remarked that he did not understand that a new
case was introduced by the amendment; and Mr. Knight (after-
wards Lord-Justice Knight-Bruce), for the complainant, remarked
that the prayer remained the same. The argument proceeded

and the vice-chancellor granted the motion, without opinion, and the order was affirmed, on appeal, by Lord Brougham, who dealt at length with the question of *lis pendens*, but took no notice of the amendment.

I will now refer to a few cases in this country relied upon for the contrary doctrine.

*Miller* v. *Sherry, 2 Wall. 237*, was a conflict between purchasers under decrees in two separate equitable suits by two separate judgment creditors of the same debtor. The first in point of time had filed a general creditors' bill, without specifying any particular property or any specific alienation in fraud of creditors. The second in point of time had set forth a fraudulent alienation by the judgment debtor of certain described lands to one Williams, who held the legal title, and who was made a party. The suit founded on the second bill was prosecuted successfully to a decree and sale, after which the complainant in the first bill amended by setting out the fraudulent conveyance to Williams, and making him a party. Process, however, was not served upon him, and he did not answer. It was held that the title obtained under the second bill must prevail, and that the first bill did not operate as a *lis pendens*, because it did not specify and describe the property and did not make the holder of the legal title a party, and that before the amendment of the first bill the legal title had passed from Williams, the fraudulent grantee, to the purchaser under the decree in the second suit. In this connection it was that the learned judge (at *p. 250 bottom*) says : " Where the question of *lis pendens* arises upon an amended bill it is regarded as an original bill for that purpose," citing *Clarkson* v. *Morgan, 6 B. Monr. 441*. These words must be confined in their scope to the case in hand. The bill which was first in point of time was, as first filed, radically defective as a *lis pendens* for want of a description of the particular property, and in not making the fraudulent grantee and holder of the legal title a party. All the authorities require these two elements to be present in order to make a valid *lis pendens*. The amendment changed the character of the suit, and made it essentially a different one. It was not the same suit.

36

The case reported in *6 B. Monr. 441 (1846)*, is long and complicated in its facts, and space forbids a complete recital of them. The bill was filed in September, 1810, against one Parker, as the holder of the legal title, who answered that in the previous March he had sold the premises to one Fowler and had no further interest in them. Fowler was never brought in as a party, but the suit was prosecuted, with varying fortunes, for about twenty years against Parker and his heirs. In its course it was found that the original parties complainant had no interest, and new parties were added. There was great delay and laches in prosecuting the suit. It was directed against the legal title only, and brought in a county and jurisdiction other than that in which the land was situated. It was found, as a fact, that Fowler and his successors obtained the equitable title before the suit was brought, and took and held adverse possession during the whole time. All these matters were relied on in refusing to give effect to the right established by the suit of 1810. I can find nothing in the report to sustain defendant's position herein.

The two cases cited by the American annotator of *Daniell's Chancery Practice* are as follows :

*Lillard* v. *Porter, 2 Head 177*, was a contest between two attaching creditors of an incorporated bank. Porter's bill was filed and his attachment (under a local statute of Tennessee) issued two days before Lillard's, but Porter's bill made parties defendant only certain of the stockholders and owners of the bank who had actual custody of its assets, ignoring the corporate existence of the bank. Lillard proceeded directly against the corporation, and it was held that Porter acquired no lien by his attachment upon the assets because it was issued against the individuals. Subsequently he amended his bill, making the bank a party, and in the meantime Lillard had perfected his lien. Though the proceedings were by a bill in chancery, the question was one of actual lien acquired by attachment. The doctrine of *lis pendens* was in no wise involved.

*Miller* v. *Taylor, 6 Heisk. 465*, was not a case of *lis pendens*, but of the statute of limitations.

In *Pierson* v. *Keedy, 6 B. Monr. 128*, the bill was filed by a

Turner v. Houpt.

simple contract creditor of a partnership firm against the surviving partner, asking to have his debt paid out of the partnership assets, which consisted of choses in action. It did not allege insolvency or fraud. Pending the bill the surviving partner settled with his other creditors and divided the assets in question among them. Subsequently the complainant obtained a judgment upon his debt against the surviving partner, and filed a supplemental bill setting up his judgment, and attacked, but not on the ground of fraud, the distribution of the choses in action among the other creditors. And it was held that his original bill showed no equity, that the supplemental bill made a different case and asked a different relief, and that the original bill could not be held to have force as a *lis pendens.* This statement shows that the case has no application here, and I may add that it was rightly decided on the ground, as the better opinion appears to be, that the doctrine of *pendente lite nihil innovetur* does not apply to choses in action.

*Dudley* v. *Price's Administrator, 10 B. Monr. 84,* was a case of the statute of limitations as applied to an amendment introducing a new and distinct cause of action.

In *Stone* v. *Connelly, 1 Metc. (Ky.) 652; 71 Am. Dec. 499,* a simple contract creditor filed a petition against his debtor setting out the debt, and that the defendant owned a house and lot which he was about to convey away for the purpose of defrauding creditors, and asked an injunction and attachment, which were granted. Shortly afterwards defendant made a *bona fide* sale and conveyance of the house and lot, and applied the proceeds to pay the mortgage upon it and an unsecured indebtedness, receiving a small balance in cash. Subsequently plaintiff sued and recovered judgment at law on his debt and had an execution issued and returned unsatisfied, and then filed a supplemental petition setting forth such facts. The defendant answered, and at the hearing the plaintiff failed on the issue of fraudulent intent in the conveyance *pendente lite.* In disposing of the case the court said: "The jurisdiction of the court to furnish the relief sought for was based and depended upon the allegation that the debtor intended to make a fraudulent disposition of the attached prop-

erty. As that allegation was not sustained by proof, the court had no power, on that ground, to order a sale of the property, nor were the plaintiffs entitled to any relief on their original petition. * * *· An entirely new *lis pendens* was created by this amendment. By it the plaintiff's right to come into a court of equity was placed upon a different and distinct ground. It did not operate as a continuation of the original equity which had been relied on, but asserted an additional and independent ground of equitable relief. It presented an entirely different state of the case, and amounted, substantially, to a new cause of action. The *lis pendens* which it created cannot be permitted to relate back to the commencement of the action, so as to affect intervening rights." This language shows the contrast between that case and this, where the equity is the same after amendment as before, viz., fraud practiced by the defendant in procuring the conveyance.

*Wortham* v. *Boyd, 66 Tex. 401,* was this : A, being indebted, made a fraudulent conveyance of land without consideration to B. B made a *bona fide* sale and conveyance for a valuable consideration to C, who had no notice of the fraud, and who paid all the purchase-money except $50. In this situation of affairs a creditor of A filed a petition in equity against A, B and C, charging fraud in the conveyance from A to B, and that C purchased with notice of it. C answered that petition, setting up that he had bought in good faith and without notice of the fraud, and had paid all the consideration money except $50, which he was ready to pay to whomsoever the court should direct. Before C answered the petition he conveyed the premises for a full consideration to D, who had no notice of the petitioner's equity and was a *bona fide* purchaser unless affected by the *lis pendens*. The original petitioner, after the answer of C denying the fraud, filed a supplemental petition admitting the truth of C's answer, and prayed that a vender's lien retained in the deed from B to C for the $50 be foreclosed, and the proceeds of the foreclosure applied to the payment of his judgment. D was not made a party. Under this amendment decree was made in favor of the plaintiff, setting aside the deed from A to B, adjudging that C was a pur-

Turner *v.* Houpt.

chaser in good faith as to the purchase-money paid, foreclosing the vender's lien for $50 and interest, which at that time brought it up to $79.40, and ordering that the lands purchased by C be sold to pay the same for the benefit of the plaintiff. The land thereunder was sold and bought in by the plaintiff, and her grantee brought an action of ejectment against D. It was held that the plaintiff could not recover.

A statement of the case shows at once that it has no application here. There was an abandonment of the original cause of action, and the adoption of a new one founded upon a different theory of the facts and rights of the plaintiff, and asking an entirely different relief, and the court rightly held that it was, in effect, the commencement of a new suit, saying: "The abandonment of one cause of action and the adoption of a new one by amendment is, in effect, the dismissal of the former suit and the commencement of a new one upon a different cause of action." The opinion is elaborate and goes wholly upon that ground.

In *Davis* v. *Christian, 5 Gratt. 12,* a testator, who was a partner in a business firm, authorized and directed his executor to continue the business as long as his wife and his surviving partner should consent. There was a power of sale of real estate, with a provision that if either of his daughters upon coming of age or being married so desired, her interest in the business might be ascertained, and the business closed as to her but continued as to the others. One of the daughters married, and a suit was instituted asking for her share of the assets. No charge of waste or mismanagement or prayer against the continuance of the business as to the other parties interested was made. Subsequently, and pending the suit, the partnership became embarrassed, and conveyance was made under the power in the will to a third party, for full consideration, of a portion of the real estate belonging to the partnership, and the proceeds taken to pay a partnership debt. *Held,* that the suit was not a *lis pendens* which prevented the sale of the real estate.

I have chosen the foregoing cases out of those cited by Mr. Brinton's counsel as being the strongest in his favor, and I

think, for the reasons already stated, they fail to support his position.

There is no hardship in applying the maxim in question to Mr. Brinton in this instance. He had complete notice of the pendency of the suit, and that it was founded upon an allegation of fraud in the exchange between Dr. Turner and Houpt. He also had notice of the incapacity of Dr. Turner at and after the suit was commenced. He made the mistake of supposing that Dr. Turner's right to recover was limited to the particular specification of fraud found in his bill, and overlooked the circumstance that he might add other specifications and finally succeed in establishing the fraud. He had no right, as I have observed, to rely on inquiries made of anybody but Dr. Turner himself; and there is nothing in what was said by Mrs. Turner or Barrows & Bliss to work an estoppel.

I shall advise a decree that Mr. Brinton convey the the premises to the complainant and account for the rents and profits, if any, in the meantime.